HAZEL ROOD, appellee, v. CITY OF AMES, appellant.

No. 48289.

(Reported in 60 N.W.2d 227)

R. G. Pasley, of Ames, for appellant.

O. J. Henderson, of Webster City, and Harold O. Hegland, of Ames, for appellee.

BLISS, J.—Although chapter 391A of the 1950 Code of Iowa was repealed by chapter 156 of the Laws of the Fifty-fourth General Assembly, approved May 2, 1951, during the construction period of the public improvement, the provisions of the repealed chapter control the determination of this action.

At a meeting of defendant's council on December 11, 1950, adjourned from December 4, 1950, it adopted a resolution "Directing the Preparation of Preliminary Plans, Specifications, Plat and Schedule for Storm Sewer Improvement Program 1951." The resolution provided that in subsequent proceedings the improvement should be known and designated as "Storm Sewer Improvement Program 1951." After stating the necessity of the improvement program, the previous selection of J. H. Ames, the city manager, as the engineer in charge of the program, and "that the cost thereof be assessed to the property benefited thereby", the resolution designated and described eight different projects to be included in the improvement.

The only one of the projects involved in this proceeding is the one referred to in the record as the "Sixteenth Street Storm

Sewer District." No other project was considered in the district court, nor will be considered in this court, as none of them affects the plaintiff's property. Just below we set out an outline of that district improvised from one of the exhibits.

The scale of the plat is very close to 1 inch to 100 feet.

The lines intersected with cross marks designate the boundary line of the Sixteenth Street Storm Sewer District. The streets and avenues are marked with the broken lines.

1142

The nine platted lots just south of 20th Street and across Burnett Avenue west of the school building in the northwest corner of the plat are in Friedrich's 13th Addition. Lying just south of 16th Street between Burnett Avenue on the west, and Duff Avenue on the east, reading from left to right, are Blocks 4, 5 and 6 in Harriman's Addition. There are forty-two lots in all—fourteen in each block. Each lot is 60 feet north and south, and approximately 180 feet east and west. The unbroken north-south parallel lines in each block indicate alleys.

The first column of lots on our plat, just east of Duff Avenue and north of 14th Street is in Block 2 of Friedrich's 5th Addition. Ten of them are 60 feet north and south and 202.4 feet east and west. The other six lots in this block do not have uniform dimensions and have lesser and different areas. Block 1 of Friedrich's 5th Addition lies between 14th and 13th Streets and has but one lot in this sewer district—Lot 11—the most southerly on the plat.

Immediately east of Block 2 in Friedrich's 5th Addition, supra, Block 2 in Friedrich's 6th Addition lies just west of Carroll Avenue and Block 3 in the same addition lies just east of it. Both abut on 14th Street. Block 2 has sixteen lots, nine of which are 60 feet by 202.4 feet and the other seven vary in dimensions and areas. Block 3 has fourteen lots, each 60 feet by 120 feet.

East of Friedrich's 6th Addition is Friedrich's 9th Addition, Block 1 of which lies west of Stafford Avenue, and Block 2 is east of it. Both abut on 14th Street. Each block has fourteen lots, twenty-four of which are 60 feet by 120 feet, and four are each about 75 feet by 120 feet.

All lots and tracts north of 16th Street, except Friedrich's 13th Addition, west of the schoolhouse are unplatted. The property of Mrs. Rood, the plaintiff, is a tract approximately 625 feet square, abutting Duff Avenue on the east and 16th Street on the south. All but a small rectangular piece in the northeast corner is in the district. While the area of the Rood land is referred to in the record as containing ten acres, the defendant computed its area as 404,536 square feet. Since there are 43,560 square feet in an acre, its area is approximately 9.2868 acres.

It was assessed $3659.02. Calling its area 9.29 acres, the assessment per acre was approximately $393.86.

The natural drainage of all of the land north of 16th Street is to the south, southwest and some to the southeast. With respect to this drainage it is the dominant land or estate and all land in the district south of 16th Street is the servient estate. The Rood land is servient to very little, if any, other land. Mr. Rood testified that in the twenty-two years he had lived on the land he had never done anything to turn the water out of its natural course or to concentrate it, or to tile it onto land of anyone else, and that whatever water or rain came onto his land passed away in the course of nature. Taking a fireplug at the southwest corner of the intersection of 16th Street and Duff Avenue as the bench mark with an assumed elevation of 100, Mr. R. J. Lubsen, a member of the Civil Engineering Department of Iowa State College, a witness for plaintiff, took elevations on the Rood land and on the Gillogly land, lying east of it across Duff Avenue. There are two houses on the Rood land, one of which is near the northeast corner. The elevation at the northeast corner of the land is 116.1, and just southeast of the house on the property line the elevation is 113.5. From that point on the elevations gradually decrease until the elevation is 98.8 at the southeast corner of the Rood land. Just east of the southwest corner of the land closely adjacent to 16th Street is a small depression, referred to by the witnesses as a "pothole." Mr. Lubsen found the area of the depression was twenty-one hundredths of an acre, having an elevation of 95.7 around its perimeter, and of about 95 at its lowest depth. The evidence without contradiction was that, except for this pothole, every foot of the Rood land has been high, dry and tillable at all times, with no water standing except in the small depression after heavy precipitation. The testimony of neighbors, of tenants of the Rood land, and of others, confirms this. Prof. R. E. Roudebush, of the mechanical engineering department of the college, had a garden in the northwest corner of the Rood acreage for four years, and was thoroughly familiar with all of the Rood land. He testified: "In all my coming and going on the Rood ten acres the only spot I have ever seen under water, rain or no rain, is that one spot, and a

little patch in my garden for a couple of days that did not do any harm."

Mr. Diehl has been the lessee of about five acres of the Rood land for some years, during which time he has raised gladioli bulbs for sale. He had close to twelve million bulbs growing there at the time he testified. He never lost any except the first year when he planted some in the pothole. All of the Rood land drains to the south across 16th Street, except an estimated two or three acres which drains southwesterly onto the Nordmeyer and Tyselling lots. Of these two tracts, Mr. Rood testified: "* * * the north end of the Nordmeyer and Tyselling lots are all wet, not so much on the Nordmeyer, although they haven't raised a crop there for the last two or three years because it is too wet. I don't think Tyselling even put in any crop this year. * * * These lots have been too wet for cultivation."

The C. J. Christensen land abuts the Tyselling land about midway on the west. It contains about .45 of an acre. It is marked on our plat with a "C". On it and adjoining land is a low place spoken of in the record as "Lake Ames." Of this tract, Mr. Rood testified: "That land is quite low. On the Christensen land last year the water accumulated to such a depth that the neighbors all got together and went down to the City Council and gave them a working over on account of that water. I was there and I know what I am talking about. The water was accumulating there, and they were afraid the children would be drowned. The city set up some sort of a gasoline driven pump and operated it during the day and pretty much all through the night, pumping the water out." This testimony was confirmed by Mr. Ames and by Mr. Starr, the head of the city engineering department.

The school grounds consist of about twelve acres, over ten acres of which is included in this Sixteenth Street Storm Sewer District. While the storm sewer was being constructed, work was being done in the erection of a new school building on the grounds at a cost of several hundred thousand dollars. The north part of the school ground is high, but the south part was low and swampy. The drainage from the Kooser land lying north of the Rood land was into this low lying school land. Mr. Rood

testified: "They had high ground to put the building on. They had this slough in here and several potholes so the architects had them put the building down in the ground so that they could take about four feet, between three and four of top soil, and move it down here * * *. During and following heavy rains there were ponds of water standing over there at the south end. I don't know how much filling they put in, but I know that they worked at it all last summer, filling the south part of the land, leveling it up for a football field." Mr. Ames testified that the south part of the school ground was fairly flat and collected water and had to be filled in very considerably with dirt.

The Kooser acreage lies just north of the Rood land. The watershed divide runs across it and only about 200,000 square feet was included in the Sixteenth Street Storm Sewer District. Drainage from it was largely into the low school ground. It is agricultural ground with buildings on it.

That part of the Gillogly land which is in the storm sewer district is the south 150 feet of the west 715 feet of the NW¼ of Sec. 35, Twp. 84, R. 24. It lies just east of the south 150 feet of the Rood land, and extends east 715 feet along 16th Street to Stafford Avenue, if that avenue were extended.

It is part of about thirty-five acres of farm land with buildings located farther north.

Before discussing the assessments in the platted additions we will refer to the pertinent statutes, and the further proceedings of the council of defendant.

Section 391A.23 of the 1950 Code provided that the construction cost of an improvement of this kind "shall be assessed against all lots within the assessment district in accordance to the special benefits conferred upon the property thereby and not in excess of such benefits."

Section 391A.24 provided: "No special assessment against any lot, for any public improvement as defined herein, shall be in excess of the estimated amount of such assessment as shown on the preliminary plat and schedule as adopted by the council and no such assessment shall exceed twenty-five percent of the value of the lot as shown by the plat and schedule theretofore approved by the council. * * *."

Section 391A.25 provided: "If the special assessment which may be levied against any lot shall be insufficient to pay its proportion of the cost of the improvement, the deficiency, * * * if for a sewer, may be paid out of its general fund, its improvement fund or its sewer fund. * * *."

Section 391A.28 provided: "Any person * * * interested * * * shall have the right within twenty days from the * * * spread of such assessments as is described in * * * section 391A.22 * * * by petition filed in the district court * * * to question any action or proceedings * * * in connection therewith * * *. Such petition shall be received, filed, and action had thereon in the district court as for other ordinary actions. * * *."

The divide in, or the upper boundary of the watershed on the school and Kooser land, was ascertained by the engineers, but otherwise the district boundary follows straight property lines, and the council determined what lots, or tracts, or parts thereof, were to be included in the storm sewer district. The 16th Street storm sewer starts on Burnett Avenue, abutting on the school property for about 200 feet, and extends south along the west side of the avenue for about 782 feet to 16th Street. It runs east on 16th Street, two feet from its north line, about 2800 feet to Stafford Avenue, and goes south down that avenue twenty-one inches from its west line about 800 feet to 14th Street. At this point it runs east and west on 14th Street. Going east it runs about 140 feet in 14th Street, fifteen inches from its south line, and then turns south and extends about 400 feet and connects with the 13th Street sewer. The part of the sewer which extends west, as noted above, runs west about 300 feet, fifteen inches, from the south line of 14th Street, and then goes north on Carroll Avenue, fifteen inches from its west line, for about 470 feet. The total length of the sewer is about 5030 feet. It has twenty-eight intakes or catch basins, and eight manholes.

The Preliminary Plat, Schedule and Estimate for Storm Sewer Improvement Program 1951, which the council had directed to be prepared at its meeting on December 11, 1950, were filed in the week following, and were adopted at a meeting of the council on December 18, 1950. Other proceedings were subsequently duly had and opportunity given to present objec-

tions to the establishment of the improvement. Mr. Rood was in a hospital at this time, and plaintiff did not learn of this opportunity and filed no objection. Construction contracts were approved March 5, 1951, the work was completed, and under date of November 6, 1951, J. H. Ames, the engineer in charge of the program, submitted a letter, as City Manager, to the city council, certifying to the completion of the Storm Sewer Improvement Program of 1951, according to the contracts. Of the Sixteenth Street Storm Sewer District the letter stated that the construction cost was $39,031.40, of which $26,389.29 was to be assessed to property, and that a deficiency of $2372.93 and additional costs of $10,269.18 were to be borne by the City of Ames.

The letter above referred to was filed with the city clerk on November 20, 1951, and on the same day the council, by resolution, accepted the work as completed and directed the city engineer to prepare and file "a schedule of assessments indicating the correct division of the assessable costs as among the several benefited properties * * *."

The city engineer, Mr. Starr, filed his schedule of the final assessments with the city clerk on December 4, 1951, approximately one year after he had filed his first or preliminary schedule of assessments. On December 4, 1951, the council "tentatively approved the plat and schedule of assessments" filed on that date and ordered them placed on file with the city clerk for public examination, and directed public notice, which was duly given, that a hearing would be held at a meeting of the council on January 2, 1952, for the consideration of any objections to any assessment. Objections were filed by plaintiff and by Tyselling, Nordmeyer and Kooser, and on February 5, 1952, the council overruled all objections except that of Mr. Kooser. In both the preliminary and the final assessment schedules the name of the owner was given in the first column, the legal description of the property in the second, the proposed charge against the property in the third column, designated "amount" at its top, the assessment in the fourth column, the "deficiency" in the fifth, and the "value" of the property, as it appeared from the records in the city assessor's office, in the sixth and

last column. The "deficiency" listed on any property is the difference between the proposed assessment against it and 25% of the value of the property as approved by the council. The value as determined by the assessor and recorded by him was of the entire legally described property, and where the part of the property included in the storm sewer district was less than the whole of it, there would be no value of the part in the assessor's records and the value was then fixed by the council or by the city engineer.

With respect to the Kooser property the figures were the same in both schedules. In the "amount" column it was $1500, in the "assessment" column, $1372.50, in the "deficiency" column, $127.50, and in the "value" column it was $5490. This last figure, from the assessor's books, is the assessed value of the entire tract, which the city engineer erroneously took, as but a part of the Kooser land was in the sewer district. The council, therefore, at its meeting on February 5, 1952, reduced the Kooser assessment by $751.50 to the sum of $621, and increased the deficiency of $127.50, as it appeared in the assessment schedules, by adding to it $751.50, to make the total deficiency, to be paid by the City of Ames for the Kooser property, the sum of $879. The value of the Kooser property, within the storm sewer district, was then fixed by the council at $2484, just four times the reduced assessment. The council then adopted Resolution 2607, "correcting, altering and revising the assessments", as effected by the Kooser reduction, and then adopted Resolution 2608—"Resolution making Assessments for Storm Sewer Improvement Program 1951."

The objections filed by plaintiff to the assessment against her property alleged in substance that: (1) It is greatly in excess of the special benefits conferred on her property; (2) it is greatly in excess of the proportionate benefits conferred on her property as compared with assessments on other property; (3) in fact her property will derive no benefit whatsoever from said sewer, but on the contrary it has been and will be damaged thereby; (4) the assessment is in excess of 25% of the value of her property; (5) the proceedings for the establishment of the

district and the construction of the sewer have not been done as provided by statute, and the assessment is therefore void.

On February 21, 1952, plaintiff filed her petition in the district court alleging the grounds of her objections, supra, and prayed that the assessment be set aside or in the alternative that it be reduced to a fair and equitable amount, not in excess of the benefits conferred upon her property as by statute provided, and for general equitable relief. She filed bond for costs. Defendant answered admitting plaintiff's ownership of the property and the assessment levied but denied the allegations, in substance set forth above, and prayed for dismissal.

The trial was begun April 8, 1952, and was submitted to the able trial court on the 24th of that month. On the 23d of May, 1952, the court filed its findings of fact and order for decree, thoroughly reviewing the record and the evidence and the contentions of the parties, and holding that the assessment against plaintiff's land could not be sustained because: (1) It is in excess of the special benefits actually conferred upon her real estate, and (2) it is in excess of the proportionate benefits actually conferred upon said real estate as compared with the assessments upon other lots and portions of real estate within the district. The other grounds for relief, as noted above, were denied. The court found that no attempt was made by the defendant to take each tract of land and to ascertain what actual benefit was received by it by reason of the establishment of the district and construction of the sewer, but, instead, the defendant assessed an arbitrary and fixed amount against each tract without regard to the benefit received by it, and no consideration was given to the character of the property, its improvements, or the natural drainage thereon or therefrom. The court's findings were incorporated in its judgment, rendered in accord therewith, filed May 23, 1952. It directed that the adjudged assessment be certified to the county auditor and substituted for the annulled assessment.

We are in agreement with the findings of the district court. The defendant and its council and engineers made no effective endeavor to ascertain the amount of the benefit which accrued to plaintiff's land or to make a proper assessment thereof. We

think this may fairly be said of other lots or tracts north of 16th Street, and also lots in Harriman's Addition and Friedrich's 5th Addition. Before any resolution was adopted by the council respecting the Sixteenth Street Storm Sewer District, it determined that all unplatted land north of 16th Street was to be assessed at the rate of three fourths of a cent for each square foot of its area, and, in addition to the area assessment, any land abutting on the sewer line was to be charged $1.00 a linear foot for such frontage.

Another method was used in assessing the three blocks of forty-two lots in Harriman's Addition lying just south of 16th Street, and between Burnett Avenue and Duff Avenue, and in assessing the sixteen lots in Block 2 of Friedrich's 5th Addition, which front west on Duff Avenue. There is no foot-frontage charge against any of these lots, not even those which abut on 16th Street, although the sewer line is on that street. Nor are any of these fifty-eight lots assessed on an area basis. All of these lots, except possibly two, are improved residence properties. The council instructed the engineers to assess these lots at a flat and arbitrary rate of $50 a lot and no more, without regard to the size or value of any lot. The total area of the lots in the Harriman Addition, without the streets and alleys, is 426,080 square feet. The total value of the lots in the Harriman Addition as shown in each assessment schedule is $125,370 and the total assessment therein shown against these lots is $2100. (The area of the plaintiff's land is 404,356 square feet. Its value is $16,895. Its assessment $3659.02.) The sixteen lots in Block 2 of Friedrich's 5th Addition have an area of 177,342.88 square feet. Their aggregate value is $68,020, with the values of the improved lots ranging from $4015 to $6930. The total assessment of these sixteen lots is $800.

The owners of the lots in Friedrich's 6th and 9th Additions were the first ones to propose a storm sewer. They wished one for that particular locality. Plans were made for one at an estimated cost of about $9900. When the council proposed the 16th Street storm sewer it was then decided to combine the two.

The council directed the engineers to use still another method of assessing these lots. Although the sewer extends along

16th Street north of these additions, and south on Stafford Avenue between Blocks 1 and 2 of the 9th Addition, and along 14th Street south of these Blocks and also south of Block 3 in the 6th Addition, and for 400 feet north on Carroll Avenue between Blocks 2 and 3 of the 6th Addition, there was no foot-frontage charge made against any of the these fifty-nine lots. The reason given was "because all of the lots were abutting on the sewer, were nearly of the same size, and all drained water into the sewers." These lots were assessed at 1.823 cents per square foot. Nine of the lots in Block 2 of Friedrich's 6th Addition were assessed $221.38, the assessments on the remainder were less, but according to their areas. In Block 3 of the 6th Addition and in the two Blocks of the 9th, the improved lots are each assessed at $131.26. The unimproved ones are each assessed $40, with deficiencies, and the values reduced from those shown in the assessor's records.

The assessment of the Gillogly land was determined by a somewhat different manner, which we will refer to hereinafter.

It is undisputed that the manner of assessment was fixed by the council as we have stated herein. Mr. Ames was asked the basis of what he called the general assessments and of the special assessments. He answered:

"The basis of the special benefit was as determined by the council, as I recall now, to be on the basis of a dollar a foot of sewer on the frontage of the property that actually abutted on the sewer; and that the general benefit shall be computed on the basis of three fourths of a cent per square foot for the entire area included in the district, *in the portion of the district which contributed the water.* [Italics ours.] * * * Q. The point of it all is, before this improvement was ever ordered, the council had made up its mind to this three fourths cent per square foot? A. It was necessary to do that in order that we could compute the assessments. We computed the assessments on the basis that was agreed upon by the council. * * * Q. Now, if I understand that method, Mr. Ames, you gave no regard whatever to the condition of the land that was assessed, or the improvements on it, or anything else. It is just a flat-footed assess-

ment of three fourths of a cent per square foot? A. That's right. Q. If, for example, Mrs. Rood's ten acres had been under water, just a slough, the assessment would be the same, $3659? A. That's right. That is correct. Q. On the other hand, if it sat up on top of a hillside without a drop of water standing anywhere on that farm, it would be the same, $3659? A. The assessment would be the same. * * * Q. In other words, you didn't take into consideration whether or not there was any water accumulation on the Rood land? A. That made no difference in the assessment as it was computed. * * * Q. Now, that frontage assessment is put on there at an arbitrary rate of $1 per foot? A. That's right. Q. Whether they use the sewer or not? A. That's right. Q. In the event that they don't have any use for the sewer at all, you would still soak them a dollar a foot frontage assessment? A. If the council so instructed me to do."

The witness testified that the frontage assessment, and the three fourths of a cent assessment applied "to all that area that contributed water to the sewer."

"Q. You didn't apply that to them all? A. That's right. Q. The reason you applied that to the Rood property and the property north of there is because you say the water came from the north and would naturally flood this property to the south, and you made Mrs. Rood pay for it? A. That's right. I didn't make Mrs. Rood pay anything. I just carried out the direction. Q. When you prepared that scale of assessment, did you think it worthwhile to go up and look at it even? A. I didn't see it was necessary because I was under instructions to prepare it a certain way. * * * Q. Well, you didn't go up and assess or take a look at that property before you made these assessments with the view of ascertaining how much the benefits were? A. No, I did not. * * * Q. Do you mean to say, Mr. Ames, you think that is a fair assessment? A. I think it is a fair assessment, but I am not posing here as a judge of these matters because they are matters that are determined by the council. *We are simply bringing in the schedule whatever way they want. They are the court of final appeal.*" (Italics ours.)

Speaking of the flat assessment of $50 a lot on the fifty-eight lots south of 16th Street, Mr. Ames testified:

"Q. The reason for confining the assessment of these lots to the exact sum of $50 is because the water from the north there is intercepted by this sewer? A. That is largely, as I recall, the council's consideration in putting an assessment on there. Q. Now, Mr. Ames, is it your idea that Mrs. Rood should pay for that intercepted water? A. That was a decision I did not participate in. Q. What is your judgment about it? A. I think she should. Q. You think she should pay for that water that nature threw down on those lots? A. I think she should pay an assessment for the water that falls on her land, even though it flows off on someone else. Q. So the intercepted water you speak of, you charge that to her and make her pay for it, instead of upon the lots on which nature intended it to flow? A. I think it the fair principle to say that the water which falls on an individual's land should be taken care of by that individual and not discharged on somebody else's territory."

Much testimony of a like nature to that of Mr. Ames was also given by Mr. Starr, the head of defendant's engineering department. He was asked how he hit upon the three fourths of a cent per square foot. He answered: "That is what the council decided on and so instructed me. Q. Yes, I know. But that was the figure you hit upon up north of 16th Street? (Mr. Pasley: I object. The testimony shows here that was the decision of the council and not the decision of this witness, nor within his knowledge.) A. That was the system used. Q. Can you tell us how the council happened to hit upon the figure of three fourths of one cent? (Mr. Pasley: Same objection.) A. No, I can't tell you how they determined that. What led them to determine that I couldn't say. I cannot testify how they arrived at the three fourths of a cent per square foot. No."

No member of the council was called as a witness by defendant to give any information on that matter. By the resolution it directed the engineer to prepare a preliminary schedule of assessments, "all as contemplated by Chapter 391A", which meant, of course, according to the benefits. This he was pre-

vented from doing by the council's specific instructions. Mr. Starr prepared that schedule, but neither he nor anyone else from the defendant went upon the ground to determine those assessments. That is his testimony. After stating that the assessment was on the basis of area and frontage, he was asked: "Q. That I suppose you could readily figure out just sitting in your office by figuring front footage and multiplying by three fourths of a cent per square foot? A. Most of it we could do from the records. Q. Not all of it? A. Why, I think most of it we could; yes. Q. That is just what you did; you sat in your office and figured it at three fourths of a cent per square foot on all lands north of 16th Street? A. That's right; that were in the watershed.* * *."

The determination of the preliminary assessment and also of the final assessment, as it was just a duplicate of the preliminary with pen and ink interlineations, were not engineering problems, but were merely arithmetical computations. As stated by the trial court, just the school and Kooser land had a curved line in their boundary. All the other tracts and lots were rectangles.

Mr. Starr testified that a topographical survey was made to show the divide or where the water drained. The lines of this divide on the Gillogly land oddly form the two sides of a right angle, the perpendicular side of which runs north and south in a straight line for about 500 feet along the west line of the Gillogly land, and the horizontal side of the rectangle was the north line of the 150 feet by 715 feet of the Gillogly land included in the district. Mr. Lubsen, for plaintiff, took elevations on the Gillogly land. At the Gillogly house about 600 feet north of 16th Street the elevation was 118.5, at the garage about 200 feet east and 50 feet south it was 116.9. From about that point and about 250 feet east of the Gillogly west line he found the water divide to run about due south for about 300 feet south where the elevation was 100.7 and east and northerly about 300 feet where the elevation was 95.4, and from there, about 250 feet from the north line of 16th Street, the watershed divide ran south to 16th Street at the east boundary of the storm sewer district where the elevation was 94.6. He found the southwest

corner of the Gillogly house was about 18.5 feet above the bench mark in 16th Street; the elevation in the Gillogly south fence line along 16th Street about 100 feet east of the fence corner on Duff Avenue was 99.4; elevations taken at distances of 100 feet east along the fence line were respectively 100.4, 103.0, 101.0, and gradually decreasing to the elevation 94.6, supra. He testified there was a definite wash into 16th Street at the point where the elevation was 99.4. At this point the grated catch basin in the sewer had an elevation of 98.3, and 350 feet farther east were two catch basins with elevations of 97.9 and 98, and another one about north of Stafford Avenue with an elevation of 93.2. Mr. Lubsen testified that all of the water from the Gillogly house south and west of the watershed divide as determined by him, and between the west and south boundary lines of the Gillogly land, comprising 8.2 acres drained into 16th Street. This was also the opinion of Mr. Allen, who was familiar with the Gillogly land, which was formerly owned by his brother. The only part of this land which defendant included in the sewer district was the south 150 feet of it 715 feet long, containing 107,250 square feet, or about 2.46 acres. The value of this strip, of course, could not be found in the assessor's books, so, as testified by Mr. Starr, "the valuation was set at $4 per foot back 150 feet", for 715 feet, or $2860. The general benefit assessment against this tract at three fourths of a cent a square foot was $804.38, which sum plus the $1.00 front foot charge of $715 made the total assessment of $1519.38. Of this sum the three fourths of a cent assessment of $804.38 was deducted as a "deficiency", leaving the final assessment the sum of $715. While this area assessment just equalled what the front foot charge would have been for the frontage of 715 feet, no frontage charge was made on the property. The assessment of $715 made against it was an area assessment. Mr. Starr's explanation of the assessment was that the Gillogly land contributed no water to the sewer district. If that was true then there should have been no assessment against the Gillogly land, under the theory of Mr. Ames, that only land which contributed water to the sewer should be assessed on either the area or front foot basis. Of course, under the flat rate of assessment adopted by the council, the

assessment paid on the Gillogly land or other land does not reduce the assessment against plaintiff's land, but we mention the Gillogly assessment as an example of the lack of uniformity in assessing like properties.

Mr. Lubsen took about 200 elevations, mostly on the Gillogly land. Mr. Starr checked many of these elevations and found no error, but disagreed with a few along the Gillogly south line to support his contention that but little, if any, of the Gillogly drainage went onto 16th Street. Mr. Lubsen was a disinterested witness.

Defendant contends in this court that the City of Ames is a very progressive and growing municipality, which may be conceded, and that the Rood property will be available and valuable for residential platting, and this may also be conceded, but that was true of the land before this storm sewer was constructed. They have not had, and have not now, any desire or intention to plat. They have made a comfortable living on the place and have been reasonably prosperous. The land was annexed to the city over their protest. They conducted a hatchery on the north five acres, and cultivated the remaining acres for many years until the disabilities of their advanced years compelled the leasing of all the property to others. There would be much expense connected with platting, including the use of a considerable part of the land for streets and alleys. There would also be sanitary sewer and paving expense. The two residences and the hatchery would have to be removed.

The trial court computed that twenty-three lots, 60 feet by 120 feet, the same size as those in the Harriman Addition—which have had the increased values conferred by platting, that defendant contends the Rood lots will have when platted—could be carved out of plaintiff's acreage. Assessed at $50 a lot, as are the forty-two lots in the Harriman Addition and the sixteen lots in Friedrich's 5th Addition, the twenty-three Rood lots would be assessed a total of $1150, instead of the assessment of $3659, which defendant levied against them. Defendant argues that thirty lots could be platted. Even so their assessment at $50 each would be but $1500.

The evidence establishes that the constructed storm sewer has added little, if any, utility to the acreage. Testimony of qualified witnesses for plaintiff was the value added to it was from $300 to $500. The water accumulating in the "pothole" is not carried away by the storm sewer, as the elevation of the catch basin just south of it is 95.7, the same as that of the perimeter of the "pothole", and the elevation of its bottom is but 95.2. Defendant argues that it could be drained by tiling into the sewer. Ordinarily, private tiling is not permitted into storm sewers (Diesing v. Marshalltown, 199 Iowa 1270, 1271, 203 N.W. 693), but if permission were given, Mr. Lubsen testified that because of existing conditions such tiling would be ineffective.

Defendant also urges that the per-acre assessments of the Nordmeyer, Tyselling and Christensen land are greater than that of the Rood land. They should be, even under a proper method of assessment according to benefits, as the evidence is undisputed that these tracts are much wetter than the Rood land.

The total assessment levied against all the properties in the district, after a reduction of the Kooser assessment, is $25,024.64. The Rood assessment of $3659.02 is $84.07 in excess of one seventh of this total assessment on property. The land lying south of 16th Street gets the greater and the substantial benefit of the storm sewer. Before it was constructed, the evidence, without contradiction, was that surface waters flowed over these properties and into the basements of these many valuable homes. The storm sewer now intercepts the floodwaters and protects these homes from damage, and yet fifty-eight of these properties are each assessed but $50, a very nominal and insufficient sum, considering the substantial value of each property.

I. There are now, and have been, in Iowa, various statutes providing for the assessments against benefited property to pay the cost of constructing public improvements, such as paving and curbing streets, sanitary and storm sewers, and combinations of the two. While the provisions of all of them have not been identical, they are, and have been, substantially as those in the statutes involved in this case. And that is, in general, that the assessment burden shall not exceed the benefits conferred on each

property, nor twenty-five per centum of its value, and shall be distributed ratably and proportionately upon all property subject to assessment.

It is established by a host of our decisions that the assessment is presumed to be correct, just and equitable, and the burden is on the appellant property owner to prove the contrary. Chicago, R. I. & P. Ry. Co. v. Centerville, 172 Iowa 444, 153 N.W. 106, 154 N.W. 596; Tjaden v. Wellsburg, 197 Iowa 1292, 198 N.W. 772; In re Resurfacing of Fourth Street, 203 Iowa 298, 211 N.W. 375; Curtis v. Town of Dunlap, 202 Iowa 588, 210 N.W. 800; Brenton v. Des Moines, 219 Iowa 267, 257 N.W. 794.

We have many times said that the test is not whether the assessment exceeds the benefits, but whether it represents a fair proportional part of the total cost. Inter-Urban Ry. Co. v. Board of Supervisors, 189 Iowa 35, 175 N.W. 743; Chicago & N.W. Ry. Co. v. Dreessen, 243 Iowa 397, 52 N.W.2d 34; In re Paving Floyd Park Addition, 197 Iowa 915, 196 N.W. 597; In re Appeal of Hahn, 197 Iowa 292, 197 N.W. 8; Early v. Fort Dodge, 136 Iowa 187, 113 N.W. 766.

The benefits may not necessarily be limited by the present use of the property, as future uses, and reasonably anticipated prospects may be considered. In re Appeal of Gilcrest Co., 198 Iowa 162, 198 N.W. 30; Gingles v. Onawa, 241 Iowa 492, 41 N.W.2d 717; Lytle v. Sioux City, 198 Iowa 848, 200 N.W. 416; In re Jefferson Street Sewer, 179 Iowa 975, 162 N.W. 239; Riepe Estate v. Burlington, 199 Iowa 373, 202 N.W. 78.

While future prospects may be considered, the purpose of their consideration is to determine the ultimate question of present actual value. Turley v. Dyersville, 202 Iowa 1221, 211 N.W. 723; Finkle v. Marshalltown, 205 Iowa 918, 218 N.W. 618. Plaintiff's property has long been used as a hatchery and in the cultivation of its soil, and part of it for the past five years has been specially used in the commercial raising and sale of bulbs. It is not reasonably to be contemplated in the determination of its value that its present uses will be abandoned to plat the ground for residential purposes. Gronbech v. Jewell Junction, 213 Iowa 358, 239 N.W. 26, where the land involved was

about eight acres of agricultural land within the improvement district. It was there held that assessments should not be based upon fictitious or fanciful estimates. See also Toben v. Town of Manson, 193 Iowa 750, 752, 187 N.W. 599, 600, where the tract involved was about nine acres out of a farm, where the court said: "Until he [owner] utilizes it in some other manner, it is assessable to him as so many acres * * * and not as so many city lots."

It is true also that simply because the land is high and dry and not in need of drainage and derives but little benefit from a storm sewer, this fact is not conclusive in the determination of whether it should be assessed for some benefit, for the removal of surface waters promptly is a benefit to all property in the community. Bell v. Burlington, 154 Iowa 607, 134 N.W. 1082. But the fact that the lot is of that character is an important factor in the determination of its proper assessment. Smith v. Marshalltown, 197 Iowa 85, 87, 196 N.W. 734, 735. In the case last-cited several plaintiffs secured the reduction in the trial court of assessments for a storm sewer. The assessments by the court were in amounts approximately one third of the assessments made by the city council. On appeal, by the city, the court affirmed the trial court in each case. We said:

"It is sufficient to observe from the record that the properties of appellees are located upon high and dry ground, and that the sewer courses from these properties on and through much lower levels; that appellees' properties should bear the lesser burden of the improvement, and the properties located on the lower levels, the greater burden. * * * We have carefully examined the evidence submitted by all parties, and find no reason to alter the assessments made by the court."

In Greene v. Marshalltown, Iowa, 203 N.W. 695, where the facts were similar to the case at bar, the assessment of the city was reduced from $6526.68 to $1200. In Collins v. Marshalltown, Iowa, 203 N.W. 696, a similar case, the assessment of the council was reduced to one third of it. In Gilgen v. Marshalltown, Iowa, 203 N.W. 696, the reduction was to 30% of the council's assessment.

In Smith v. Marshalltown, supra, at page 86 of 197 Iowa, the court said: "The total area of the lots and portions of lots within that portion of the district to be assessed with the cost of said sewer having been ascertained, and the total cost having been divided by the number of square feet thus burdened, the cost per square foot was determined in that portion of the district burdened with the total cost of the sewer, and the assessment against each lot and parts of lots was determined by multiplying the number of square feet in each lot and part of lot by the common multiplier, the cost per square foot, without regard to its location or proximity to the sewer or proportion to the benefits. The figures thus obtained * * * were adopted by the city council, and the assessments complained of were thus determined. The balance of the area of said district was not assessed with any part of the cost of the sewer."

In Diesing v. Marshalltown, 199 Iowa 1270, 1271, 1274, 203 N.W. 693, 694, 695, the facts were quite similar to those in Smith v. Marshalltown, supra. The trial court reduced the special assessments for a storm sewer constructed upon lots and unplatted ground, of about 100 acres. We there said: "The assessments spread upon these lots and tracts by the city council were in proportion to their area, and *without regard to their elevation or location.* [Italics ours.] * * * All of this land slopes toward the depression in the central part of the district * * *. * * * The sewer does not affect the natural drainage from the land. The water falling upon it must and does flow off it before it can reach the sewer." This court modified the assessments of the trial court by increasing them until the assessment upon each lot was equal to one third, and upon the unplatted tract equal to one fourth of the assessments made by the city council.

██ The statute involved here does not specify any particular method or measure to be used in determining the assessments. The council may use its own judgment to a reasonable extent. It is not improper to use an area or a front rule method. But any method must be so used as to effect the ascertainment of assessments that are just and equitable and properly apportioned over the district. Madison County v. Winterset, 164 Iowa 223, 145 N.W. 492; Hansen v. City of Missouri Valley, 178 Iowa

859, 160 N.W. 340. The area or frontage methods cannot be made the sole or conclusive basis of determining the assessments without regard to all other factors, as was done by the city council in the case before us. The defendant wholly disregarded the advantages conferred upon plaintiff's land by nature, and in fact penalized plaintiff because the water which came upon her land passed off onto land of lower levels as nature provided it should. The storm sewer protected the lots south of 16th Street by intercepting this surface water and for this benefit these lots should have been assessed their fair share of the cost of the sewer, instead of but a nominal sum, and thus shifting an excessive and disproportionate portion of the total cost upon plaintiff.

█ It is impossible to ascertain the exact benefits conferred upon any lot by an improvement of this kind, but we are convinced that the assessment as determined by the district court is a fair approximation of the benefits which accrued to plaintiff's land, and a fair proportional part of the total cost of the improvement, and that plaintiff fully established the allegations of her petition that the assessment against her land exceeded the special benefits conferred on it and was in excess of the proportionate benefits as compared to assessments on other lots and tracts in the Sixteenth Street Storm Sewer District.

The judgment of the district court is therefore—Affirmed.

All JUSTICES concur except GARFIELD, J., who takes no part.