**NORTHERN PACIFIC RAILWAY COMPANY, a Corporation, Plaintiff and Appellant,**

**v.**

**CITY OF GRAND FORKS, a Municipal Corporation, et al., Defendants and Respondents.**

No. 7446.

Supreme Court of North Dakota.

Sept. 23, 1955.

Rehearing Denied Dec. 19, 1955.

Conmy & Conmy, Fargo, for plaintiff and appellant.

Harold D. Shaft and Gordon Caldis, Grand Forks, for defendants and respondents.

BURKE, Chief Justice.

This appeal is from a judgment rendered in an action to enjoin the collection of certain special assessments levied against plaintiff's property in the City of Grand Forks. Judgment for the dismissal of the action was entered in the district court. Plaintiff has appealed from the judgment and demanded a trial de novo in this court.

The project for which the assessments were levied was a parking lot to provide off street parking facilities for the prin-

cipal business district of Grand Forks. The city council approved the project, adopted a resolution of necessity with respect thereto, provided that twenty percent of the cost should be paid by a general tax upon the whole city and that eighty percent of the cost should be levied as a special assessment and established a special assessment district within which the special assessments were to be levied.

Thereafter the special assessment commission inspected the property to be assessed. They agreed upon a method of determining the benefits which the property to be assessed would derive from the project and upon a plan for levying the special assessments. In the case of each property description the benefits determined were in excess of the assessment levied. The work of the special assessment commission was ratified by the city council and the assessments were extended upon the records.

Plaintiff has challenged the assessments levied against its property upon three principal grounds. Firstly, it urges that Sections 40–2201 and 40–2209, 1949 Supp. to NDRC 1943 are unconstitutional to the extent that they authorize the payment for parking lots by special assessment. It contends that such authorization when exercised takes property without compensation and without due process of law in violation of Sections 1, 13, 20 and 22 of the Constitution of the State of North Dakota and the 14th Amendment of the Constitution of the United States. Secondly, appellant says that the special assessments are void because its property received no benefits whatsoever from the parking lot improvement. Thirdly, it asserts that the assessments were made by an arbitrary inflexible rule which was so lacking in equity and equality that it amounted to constructive fraud.

The constitutional question is general in nature and resolves into the question of whether in any circumstances the special assessment device can be used to defray the cost of a public off street parking lot without doing violence to the Constitution. An affirmative answer to this question depends upon whether property, in the vicinity of the parking lot, which has been constituted a special assessment district, derives a special benefit from the improvement in addition to the general benefit in which the whole city shares.

We have no doubt but that property in the vicinity of a parking lot derives special benefit therefrom. Particularly is this true in the case of a congested business district which had its development before automobiles and trucks had become the great convenience and problem that they are today. In recent years there has been a trend toward a decentralization, evidenced by the removal of many businesses from congested areas to outlying districts where parking lots for customers were available. It is generally acknowledged and logically so, that the provision of parking space in the vicinity of a congested mercantile area, by making it conveniently accessible to trade, tends to reverse this trend and thus stabilize business in the area. This is a special benefit sufficient to justify special assessments. City of Whittier v. Dixon, 24 Cal.2d 664, 151 P.2d 5, 153 A.L.R. 956; Ambassador Management Corp. v. Incorporated Village of Hempstead, 186 Misc. 74, 58 N.Y.S.2d 880, Id., 270 App.Div. 898, 62 N.Y.S.2d 165, appeal dismissed 296 N.Y. 666, 69 N.E.2d 819, certiorari denied 330 U.S. 835, 67 S.Ct. 971, 91 L.Ed. 1282.

The question of whether the benefit to each lot or parcel of land in the district has been determined with sufficient accuracy to avoid the constitutional prohibition against taking property without compensation or due process of law is one which must be determined according to the means used and the results achieved in each case.

In this state, however, special assessments must conform to a statutory as well as a constitutional standard. The applicable statute is Section 40–2307, 1949 Supp. to NDRC 1943. It reads as follows:

"Whenever the commission is re-quired to make any special assessment under the provisions of this chapter, the members thereof personally shall inspect any and all lots and parcels of land which may be subject to such special assessment and shall determine from such inspection the particular lots and parcels of land which, in the opinion of the commission, will be especially benefited by the construction of the work for which the assessment is to be made. The commission shall determine the amount in which each of the lots and parcels of land will be especially benefited by the construction of the work for which such special assessment is to be made, and shall assess against each of such lots and parcels of land such sum, not exceeding the benefits, as shall be necessary to pay its just proportion of the total cost of such work, or of the part thereof which is to be paid by special assessment * * *."

Since compliance with the foregoing statutory requirements would undoubtedly remove all constitutional objections we shall confine our consideration to the question of whether in the instant case there has been compliance with the statute with respect to the assessments made upon plaintiff's property.

■ To conform to the statute, special assessments must meet three requirements. The special benefit accruing to each lot or parcel of land from the improvement must be determined. The special assessment levied against each lot must be limited to its just proportion of the total cost of the improvement. The assessment against any lot or parcel of land must not exceed the benefit which has been determined to have accrued thereto. The method used and the procedure followed in spreading the special assessment in this case are described in the testimony of Mr. Olaf Thorson, Chairman of the Special Assessment Commission. This testimony is as follows:

"Q. What methods of spreading the assessments did you consider and discuss?

A. To begin with, I think it was my opinion, and I also think of other members of the commission, that some method of zoning the district would be possible.

"Q. By that you mean some arrangement whereby certain areas would be assessed at a higher figure than other areas? A. That is correct.

"Q. You have upon occasion worked out special assessments on what you call a unit basis, assigning units of value to the various properties? A. Yes, we have.

"Q. Did you attempt to work out such a thing on this?

*    *    *    *    *    *

"A. Yes, we did. In fact, we probably spent at least two evenings trying to formulate a plan on that basis. * * *

"Q. Any other basis that you have in mind that you did discuss? A. I might explain somewhat the thinking, if I may.

"Q. Yes? A. We thought perhaps that being that the parking lot was located somewhat to the side * * * that perhaps a method of zoning so that the properties located more closely to the parking lot should bear a larger part of the cost and by reason of their proximity to the parking lot be benefited more. We tried to zone. We found among other things, that the area closest to the parking lot at the present time, at any rate, is not occupied commercially except by the Northern Pacific Railway and its tracks. We, as a matter of fact, could not see that those properties were more particularly benefited or that they would probably be more benefited in the future than, for instance, a piece of property two blocks away. * * * There was no basis we could arrive at for splitting the district. * * * So we had to abandon the zoning idea. We could not figure out any system that seemed at all equitable. Another thought we had on zoning was to try and allot to the blocks having the larger and more commercial buildings a higher assessment than to those that were not so occupied. We came to the conclusion that we could not

speculate as to the future on what buildings might be on any particular lot. * * * '

"Q. To summarize what you have just been saying, you members of the special assessment commission in your session discussed thoroughly every possible way you could think of to fairly spread this assessment, is that correct? A. Yes, we did.

"Q. And what was your ultimate determination? A. We determined to spread the assessment on a front "footage basis, with a few minor alterations * * *. It seemed to us in the commercial and business district that frontage is really what counts * * *."

The benefits were determined and the assessment was spread upon a foot frontage basis with the result that, with a few exceptions, the assessment was at the rate of $6.69712 per front foot for each lot, without regard to its location, character, present use or adaptability for future use. At what rate per front foot benefits were determined is not shown by the record. There is only the statement the benefits exceeded the assessment. We think it may be presumed from the record that the amount necessary to levy against each front foot in order to raise the amount of the cost of the parking lot was first computed and that the benefits were thereafter determined at a slightly greater sum per front foot.

■ Where, as in this state, special assessments must be apportioned according to benefits the foot frontage method is only acceptable when it achieves that result. It can only be used in cases where benefits conferred upon the assessed property are equal and uniform. Morse v. City of Omaha, 67 Neb. 426, 93 N.W. 734; Village of Winside v. Brune, 133 Neb. 80, 274 N.W. 212; Thacker v. Paving Improvement District No. 5 of Mena, 182 Ark. 368, 31 S.W.2d 758; In re Improvement of Rockwood Boulevard (Sperry v. City of Spokane), 170 Wash. 64, 15 P.2d 652; Harlan v. Town of Bel Air, 178 Md. 260, 13 A.2d 370; Rood v. City of Ames, 244 Iowa 1138, 60 N.W.2d 227; White v. City of Tacoma, C.C., 109 F. 32.

In Minneapolis, St. P. & S. S. M. R. Co. v. City of Minot, 51 N.D. 313, 199 N.W. 875, 37 A.L.R. 211, this court sustained a special assessment for a water main which was made upon a foot frontage basis and where the special assessment commission did not consider the character of the improvements upon the lots or the use that was being made of them. In doing so we said, 51 N.D. 321, 199 N.W. 877:

"Practical men, acting in the capacity of special assessment commissioners, will necessarily find various properties, which are uniform in size and which are similarly situated with reference to an improvement, to be benefited in equal degree, with the result that there will be an equal assessment of benefits."

Without reaffirming the foregoing statement, we think it apparent that while the view stated may apply to special assessments for such improvements as, sidewalks, pavements, water and sewer which are improvements upon which the assessed property actually abuts for the distance of its foot frontage, it cannot apply to a special assessment for a parking lot. The reason for this is that the principal special benefit conferred upon a lot by the establishment of a parking lot in its vicinity is proportionate to need that the business conducted thereon has for a parking lot. The parking lot encourages members of the public to shop in a congested district by providing a place where they can leave their cars within easy walking distance of any place within the district. For the same reason it encourages attendance at theaters, and the rental of apartments, professional offices and hotel rooms in the district. A parking lot may have several objectives but in so far as special benefits are concerned its objective is to maintain or increase the business done in the district and those who share in the business it brings are those who reap the major share of the special benefits. Special assessments for parking

lots which do not give effect to substantial and material differences in the use of the property assessed are therefore not apportioned according to benefits as required by statute.

The question then is, did the use of the foot frontage method in this case result in more than a just proportion of the cost of the improvement being assessed against the property of the plaintiff.

We shall give consideration, first, to the property of the plaintiff in block 38 and in the north half of block 16. This is vacant property and part of the low lying land adjoining the Red River. It is subject to flooding in times of high water. Prior to 1947, there were several businesses located upon similar land in the vicinity but after the floods of 1947, 1948 and 1950 these businesses moved out and found new locations. At the present time the only businesses located on land similarly situated are a bottled gas storage plant and a single gasoline storage tank. We think it clear that the parking lot is of no present benefit whatever to these lots. As to their possible future use defendants' witnesses testified that this land might be used for a parking lot, trailer court, or for storing scrap iron. We cannot see how a parking lot can confer benefits upon lots which have no present use and no reasonable possibility of future use for purposes other than those suggested by the witnesses.

In the north half of block 17 plaintiff owns 12 twenty-five foot lots which were all assessed on the foot frontage basis according to the standard adopted. There are no improvements upon these lots except the tracks of the plaintiff. A strip 125 feet long extending into the lots from about the center of their southern boundary is used as a parking lot. Another section of these lots between the tracks is leased to a lumber company which has sublet it to an automobile dealer for the storage of used cars. According to the testimony there is no business of any kind conducted on these lots. We therefore see no present special benefit accruing to them from the parking lot improvement. It is said, however, that the assessment is justified by the possible future use that may be made of this property. It is argued that if businesses are established on this property at some future time, it would be unjust to have it exempt from the assessment. We think this argument is of little weight when applied to property which has been committed to a definite use by a substantial investment. Before the use of such property can be changed the investment therein may have to be sacrificed and a new investment made. Certainly that is true in the case of the lots under consideration. These lots have been occupied by railroad tracks for sixty years. It is highly speculative to assume that the railway company will now tear them up and build business buildings on the land. See Rood v. City of Ames, 244 Iowa 1138, 60 N.W.2d 227. To adopt the theory contended for would be to say that in order to prevent a future wholly speculative injustice, we must approve one which is both immediate and certain.

The railway company's land in the north half of block 24 is occupied by a wholesale grocery business, spur tracks, loading platforms and a parking space 300 feet long and wide enough to permit cars to park diagonally. The business buildings contain the offices, warehouse and garage of the grocery company. The garage has room for five trucks and adjoins the warehouse. All loading of the trucks is done in the garage. While the trial court found as a fact, that the parking facilities in this block are not sufficient to meet the needs of the wholesale grocery company, this finding was contrary to the testimony of plaintiff's witnesses who said it was sufficient to take care of the parking needs of both the employees and customers of the wholesale grocery and was used to some extent by the public. It is clear, however, that a wholesale grocery, which in the main goes to its customers, has less need for and derives less benefit from a public parking lot than retail merchants whose customers must come to them and that the need for a parking lot and the benefit derived from it are diminished to the extent that the

portion of the lots assessed, devoted to parking, fills that need. The result, of the method of assessment used, is that this half block with one business located thereon, and which provides most if not all of its own need for parking, was assessed at practically the same rate per front foot (Some adjustment was made because the lots were only 110 ft. long) as blocks in the more congested part of the district where there were many retail businesses and no parking facilities whatever. We think this result burdens the north half of block 24 with more than its proportionate share of the special assessment.

We next consider the lots of the plaintiff in the south half of block nine and the south half of block sixteen. These lots are occupied by railway company's station and freight house and a small floral shop. The assessed lots front on Third Street for a distances of 400 ft. and are assessed for $2,676.64 or at the same rate per front foot as the well built up blocks containing such businesses as hotels, professional office buildings, theaters and retail stores. The railroad station and freight house are built back from the street line a distance of from 20 to 25 feet so that access to them by truck and car is available on the property of the railway. In addition there is a parking lot at the rear of the station sufficient to take care of the needs of the employees of the railway company. The railway of the plaintiff at Grand Forks is a branch line and on the average nine to ten passengers get on and off the trains there each day. The freight business is largely car load lot business as most of the less than car load lot business is handled by commercial truckers. To assess this property at a higher sum than the block immediately south of it, which was assessed $2,007.54

and which is occupied by a three story brick building with a supermarket on the ground floor, a three story brick building with a furniture store on the ground floor, a three story brick building with an automobile salesroom on the ground floor, and a six story hotel building with a dry cleaners pick-up and delivery station, an appliance shop, liquor store, fur shop, beauty shop, barber shop, cafe and bar on the ground floor and which has no facilities for parking whatever, we think is so clearly disproportionate that it needs no further demonstration.

Plaintiff has also challenged the assessment of certain lots in block thirty-six. Plaintiff has no interest of record in these lots although two of its spur track cross their east end. The lots are assessed in the name of Robertson Lumber Company and there appears to be no liability whatever upon the railway company for the payment of these assessments. It is therefore in no position to challenge them.

We have concluded that the use of the foot frontage method of assessment in this case has resulted in assessing against the plaintiff's property in blocks 9, 16, 17, 24 and 38 more than its proportionate share of the cost of the improvement and that plaintiff is entitled to the injunction prayed for in its complaint with respect to these assessments.

The judgment of the district court is reversed and the case remanded for the entry of judgment in accordance with this opinion.

GRIMSON, JOHNSON, SATHRE and MORRIS, JJ., concur.