Wm. J. MURPHY, John B. Rhud, Laura M. Hughes, P. R. Webb, C. P. Nelson, George L. Baska, Maude Grambs, G. W. Grambs, Alice Owens, and H. M. Beall, on behalf of themselves and all other taxpayers similarly situated, Plaintiffs and Appellants,

v.

CITY OF BISMARCK, a municipal corporation, Tom Baker, as City Auditor of the City of Bismarck, Katie Peterson, as Treasurer of the City of Bismarck, and Evan E. Lips, as President of the City Commission of the said City of Bismarck, Defendants and Respondents.

No. 7941.

Supreme Court of North Dakota.

May 29, 1961.

638

A. J. GRONNA, District Judge.

This is an appeal by the plaintiffs, abutting property owners, from the judgment in favor of the City of Bismarck in a civil action in the district court of Burleigh County, the Honorable H. E. Rittgers, District Judge, presiding. Plaintiffs demand a trial de novo. Such judgment determines and adjudges:

(1) That Street Improvement District No. 60 was legally and properly created in March 1960 by Ordinance No. 1358, enacted by the board of city commissioners of Bismarck to widen, pave, and otherwise improve an interconnecting network of streets and avenues lying within twenty-eight contiguous blocks;

(2) That protests filed by the plaintiffs and other property owners of the district were insufficient to bar the proposed improvements and special assessments;

(3) That the plaintiffs' demand for an injunction against the proposed improvement of Avenue C should be and was denied, plaintiffs being the owners of properties generally lying adjacent to Avenue C between Third Street and Ninth Street (six blocks); and

(4) That, inasmuch as construction work has not been commenced and no special assessments have been levied at the present time, any question of benefit or detriment to the plaintiffs is premature and, further, that no injunction can be granted to prevent a legislative act by a municipal corporation, namely, determining the benefit which the object of the assessment confers on the owner of each lot or parcel of abutting property and then laying a special assessment in the amount of such benefit.

Statement of Facts.

The widening of the paving will not require a widening of the right of way upon and along any of the streets and avenues in District No. 60, inasmuch as such right-of-way width now is, and has been, eighty feet. The City presently owns, in

Rausch & Chapman, Bismarck, for plaintiffs and appellants.

John A. Zuger, City Atty., Bismarck, for defendants and respondents.

trust for the public, right of way eighty feet in width; consequently, all of the proposed construction and all of the trees which will be removed are within and upon the presently owned right of way. The only trees which will be removed are those in the path of construction.

Avenue C, between Third Street and Ninth Street, is paved to a width of only twenty-five feet. Such paving is over forty years old and the present curbing is broken and in need of replacement or repair, and there are no gutters. Such narrow width of twenty-five feet has required prohibition of street parking so that not even abutting owners may park. The zoning is residential, mostly multiple-family dwellings.

On March 29, 1959, Ordinance No. 1308 established the following standard of paving for residential areas throughout the city of Bismarck, to wit: "(a) The standard width shall be 36 feet." Ordinance No. 1308 was enacted pursuant to the provisions of Section 40–56–02, N.D.C.C., which provides: "The governing body of any city may, by ordinance, establish standards of paving for residential areas which standards shall be uniform throughout the entire city, and said ordinance may be amended or repealed in the same manner as other ordinances of the city."

On March 29, 1960, the board of city commissioners, pursuant to the provisions of Section 40–56–03, adopted a resolution declaring the necessity of an improvement in Street Improvement District No. 60, section 3 of which resolution reads: "Such portion of the cost of said paving as exceeds the cost of standard paving in residential areas, as established in Ordinance No. 1273, as amended [by Ordinance No. 1308], shall be paid by ad valorem taxes to be levied upon all taxable property within the City, subject to approval of such levy by the Board of Budget Review. The remainder of the cost of said improvement shall be specially assessed against the respective lots, tracts, and parcels of land lying within said improvement district in amounts proportionate to and not exceeding the benefits derived therefrom."

Section 40–56–03, N.D.C.C., provides: "When any city has, by ordinance, established standards of paving for residential areas, the city as a whole, by action of its governing body, may pay not to exceed twenty per cent of the cost of the paving, and if because of heavy traffic upon such street or for other valid reason, the governing board determines that the established standards should be exceeded in any portion of a residential paving project such percentage of the excess cost of paving as may be determined by action of the governing body shall be borne by the city as a whole."

Accordingly, although Avenue C and the other streets and avenues in the district will be widened and paved to a width of forty-eight feet, such excess of twelve feet over the standard width of thirty-six feet will be paid by ad valorem taxes levied upon all property within the city, and no special assessments will be made for such excess cost of said improvement.

It appears from the affidavit of the city auditor that the board of city commissioners had proposed that a residential home owner through special assessment should pay fifteen per cent of the cost of the improvement.

Pursuant to said resolution of March 29, 1960, supra, the city auditor caused to be published notice of advertisement for bids for the work and materials required for the construction of said improvement. Thereafter, the City proceeded to accept the lowest bid and award a construction contract for the work to be done. Then, on May 5, 1960, this civil action was commenced and a restraining order was served upon the defendant city officials, and on May 20, 1960, the Honorable George Thom, Jr., District Judge, issued an order granting temporary injunction which ordered that, "during the pendency of this action, or until the Court shall otherwise order, the defendants [the City] be, and they are, enjoined and re-

strained from taking further action toward the levy and assessment of special assessments upon the property of plaintiffs and other taxpayers similarly situated and from issuance of special assessment warrants in connection therewith."

This action was tried before the Honorable H. E. Rittgers, one of the judges of the Fourth Judicial District, who had been requested to try the case by the Honorable George Thom, Jr. Judge Rittgers, after hearing and considering the evidence, issued his memorandum decision in favor of the defendants, and judgment was entered accordingly. From this judgment the plaintiffs have appealed, demanding a trial de novo.

Avenue C is located in a residential area and runs east and west through the approximate center of Bismarck, and is a crossbar between the north-and-south streets. A six-blocks-long portion of Avenue C, from Third Street to Ninth Street, is the longest continuous street in District No. 60.

District No. 60 covers an area lying north and west and east of the main business district of the city and is adjacent thereto on three sides. Streets from the business district leading into District No. 60 are forty-four to forty-eight feet in width (mostly forty-eight) and narrow down to twenty-five, thirty, or thirty-five feet within District No. 60. In a related, connected, and uniform manner with respect to the business district, the improvement project will widen and otherwise improve the streets in District No. 60. This local problem may be illustrated by an imaginary small funnel. Note the small spout through which liquids may flow from the hollow cone. But, small as it is, the spout is adequate for the small capacity of the cone. Suppose the cone is increased to a capacity of several gallons, say ten. Then the spout would be inadequate and it would have to be replaced by a much larger one to discharge the contents of the ten-gallon cone.

More than forty years ago, when Avenue C was paved to a width of twenty-five feet, as were its interconnecting streets, it and the other streets were adequate for vehicular traffic because the volume of traffic was relatively small. Presently, in 1961, the population and the traffic, particularly out-of-town traffic, through growth during the past forty years, have become much greater. Thus, through no fault of anyone, the problem of traffic congestion has evolved, which in turn has caused the governing body of the city to create Street Improvement District No. 60 as a matter of necessity. Traffic coming from the wide, forty-eight-foot streets of the business district fans out to the north or east or west into the narrowed-down streets, generally twenty-five feet wide, of District No. 60, and the governing body of the city, in the exercise of its legislative authority, has determined that the heavy volume of such traffic necessitates the widening of the narrow streets.

The streets and twenty-eight blocks embraced in the district include: one block on First Street, two blocks on Second Street, three blocks on Third Street, three blocks on Fifth Street, one block on Seventh Street, four blocks on Ninth Street, six blocks on Avenue C, three blocks on Rosser Avenue, one block on Thayer Avenue, and four blocks on Avenue D. Property owners adjacent to such streets and avenues have no parking available; otherwise, narrowness makes two-way traffic unsafe.

It should be noted that only after consultations or hearings were held with the city engineer, police and fire officials, citizens groups, and property owners in District No. 60 did the board of city commissioners determine that the proposed improvements were needed. Thereafter, the improvement district was created and its boundaries were established by Ordinance No. 1358, on March 29, 1960. The district boundaries run one-half block back from each of the streets and avenues upon which the improvements are proposed.

Pursuant to the provisions of Sections 40–22–10 and 40–22–12, N.D.C.C., the city engineer submitted plans and specifications and an estimate of the probable cost of the

work to the board of city commissioners, and, pursuant to Section 40–22–11, such plans were approved by resolution on March 29, 1960.

The purposes embraced in the improvement district are common to all of the streets, avenues, and areas in the district, so there is commonness, unity, and singleness in the location, purpose, and character of the improvement. The proposed work on all streets in the district is uniform and the same, and the width is forty-eight feet with the few exceptions where forty-four feet matches the streets in the business district. The present curb sections will be removed on all streets and avenues, and new combination curb-and-gutter sections, at proper width, will be constructed. Necessary excavation will be made on either side to allow for a six-inch stabilized gravel base, to which would be added a 2½-inch asphaltic-concrete leveling course which would bring it to the same concrete elevation as the present street section. Then, through the entire section, including the new section and the present section, there would be placed a two-inch asphaltic-concrete wearing course and a seal-and-cover aggregate application. The proposed construction on intersecting streets is related, connected, and uniform, as drainage design will be worked out jointly.

In adopting Ordinance No. 1358, creating Street Improvement District No. 60, and in the adoption of resolutions, the city commission has in all things proceeded strictly in accordance with the statutory requirements, and the same is true with respect to the preparation of estimates of probable cost of the proposed construction and of the plans and specifications by the city engineer. The statutory provisions for filing such documents in the office of the city auditor have been observed.

### Issues.

Since opposing attorneys in this case disagree upon the issues or questions to be decided, the contentions of each side are quoted at length, as follows:

(a) At page 30 of the brief of plaintiffs and appellants, the "issues" are stated thusly:

"1. Did not the city of Bismarck arbitrarily, improperly and unlawfully re-create Street Improvement District No. 60 in the year 1960 when said district and project had been effectively terminated by sufficient protests of taxpayers in the year 1959, and did defendants act in good faith in the proceedings and actions taken during the year 1960?

"2. Were not sufficient protests filed by taxpayers including the plaintiffs insofar as the same related to the described separate property area included within the district for which property of plaintiffs and other taxpayers similarly situated would be subject to assessment?

"3. Where the proposed improvement involving street widening in a residential area will not confer any benefit upon the plaintiffs' properties but rather give rise to a detriment may the municipality defray the cost or any part thereof of such proposed improvement by the special assessment method?

"4. Is the action of plaintiffs premature?

"5. Will not actions of defendants deprive the plaintiffs and other taxpayers similarly situated of their property without due process of law and further be in violation of the Constitution of the State of North Dakota as set forth in the complaint?

"6. Did the plaintiffs receive a fair and impartial trial?

"7. Should not the judgment herein be in all things reversed?"

(b) At page 16 of the brief of defendants and respondents, the following "issues" are stated:

"I. What are the boundaries of the special improvement district, Street Improvement District No. 60, and was the district validly created.

"II. Were the protests filed by the plaintiffs sufficient to bar the proposed improvements, under the applicable statutes.

"III. Whether there is, on the facts or as a matter of law, a benefit to the property of the plaintiffs in some degree.

"IV. Whether the action of the plaintiffs is premature."

## Decision.

In this State, cities are incorporated through general law of the Legislature. They are mere creatures of the statute. They are political subdivisions of the State, auxiliaries for purposes of local government, exercising a part of the powers of the State. Through the device of municipal corporations, a portion of the legislative power of the State is delegated to local authorities. Waslien v. City of Hillsboro, 1922, 48 N.D. 1113, 188 N.W. 738; Powers and Procedures of City and Village Governing Boards by Harold D. Shaft, City Attorney, Grand Forks, 31 North Dakota Law Review 137 (April 1955); State ex rel. Dreyer v. Brekke, 1947, 75 N.D. 468, 28 N.W.2d 598; State ex rel. City of Minot v. Gronna, 1953, 79 N.D. 673, 694, 59 N.W. 2d 514, 529. In Megarry Bros. v. City of St. Thomas, N.D.1954, 66 N.W.2d 704, 709, this court said:

"Section 130 of the North Dakota Constitution directs the legislative assembly to provide by the general law for the organization of municipal corporations. These municipal corporations when created pursuant to statute become agencies of the state and have only the powers expressly conferred upon them by the legislature or such as may be necessarily implied from the powers expressly granted."

In Lang v. City of Cavalier, 1930, 59 N.D. 75, 84, 228 N.W. 819, 822, this court said:

"A municipal corporation is an agency of the state. It is purely a creature of statute. Constitution, § 130. It takes its powers from the statutes which give it life, and has none which are not either expressly or impliedly conferred thereby or essential to effectuate the purposes of its creation. In defining its powers, the rule of strict construction applies, and any doubt as to their existence or extent must be resolved against the corporation. * * * But the existence and extent of a municipal corporation's powers having been determined and measured the rule of strict construction no longer applies, and the manner and means of exercising those powers where not prescribed by the Legislature are left to the discretion of the municipal authorities." Quoted with approval in James v. Young, 77 N.D. 451, 456, 43 N.W.2d 692, 696, 20 A.L.R.2d 1086, 1091.

In Powers and Procedures of Governing Boards, supra, by Harold D. Shaft, City Attorney, Grand Forks (31 N.D.L.R. 137). the limitations on powers of such boards are set forth as follows:

"Since municipalities are creatures of the legislature it is always necessary that the governing board look to the law for its authority, for it has no powers except those expressly or impliedly given it by law.

"Its authority is limited in two ways. First, the board can do only that which it is expressly or impliedly authorized to do, and, second, even those things it is authorized to do may be done only in the manner prescribed by law. Thus, when any municipal action is contemplated, the first question must always be: 'Has the legislature authorized this?' Having answered that question in the affirmative, it then must be asked,

'Has the legislature stated how it must be done?' "

The statutes of North Dakota grant to cities the power to widen, pave, and otherwise improve streets and avenues. Section 40–05–01, N.D.C.C., provides:

"The governing body of a municipality shall have the power: * * * "8. * * * To lay out, establish, open, alter, repair, clean, widen, vacate, grade, pave, park, or otherwise improve and regulate the use of streets, alleys, avenues, sidewalks, crossings, and public grounds, and to acquire, construct, maintain and operate parking lots and facilities for motor vehicles; to regulate or prevent any practice having a tendency to annoy persons frequenting the same; and to prevent and regulate obstructions and encroachments upon the same."

In Green v. Beste, N.D.1956, 76 N.W.2d 165, 168, this court said:

"The statutes of North Dakota grant the city power to pave and otherwise improve the street, Section 40–0501(8), 1953 Suppl. NDRC 1943; to defray the expense thereof by special assessments, Section 40–2201(4), 1953 Suppl. NDRC 1943; to call for bids, Section 40–2219, 1953 Suppl. NDRC 1943; and to borrow money when necessary, Section 40–0501(5), NDRC 1943. The only requirement is that the statutes governing all these matters be strictly followed."

 In Megarry Bros. v. City of St. Thomas, supra, 66 N.W.2d 704, 709 (1954), this court said:

"Among legislative grants of power to cities is the power to create improvements by the special assessment method as set out in Chapter 40–22, NDRC 1943 and amendments thereto. It appears from the evidence in this case that the pavement involved was an improvement which the City of Saint Thomas

sought to make pursuant to the provisions of Chapter 40–22, supra."

Section 40–05–01, N.D.C.C., reads as follows:

"Powers of all municipalities.—The governing body of a municipality shall have the power:

"1. Ordinances. To enact or adopt all such ordinances, resolutions, and regulations, not repugnant to the constitution and laws of this state, as may be proper and necessary to carry into effect the powers granted to such municipality or as the general welfare of the municipality may require, and to repeal, alter, or amend the same. * * * " For definitions of "ordinance" and "resolution," see Mitchell v. City of Parshall, N.D.1961, 108 N.W.2d 12.

Section 40–22–08, N.D.C.C., authorizes cities to create paving districts by ordinance or resolution. Will v. City of Bismarck, 1917, 36 N.D. 570, 163 N.W. 550. Section 40–22–08 refers to a paving district as a "street improvement district."

Section 40–22–09, N.D.C.C., provides in part:

"Size and form of improvement districts—Regulations governing.— * * * Each improvement district shall be of such size and form as to include all properties which in the judgment of the governing body, after consultation with the engineer planning the improvement, will be benefited by the construction of the improvement project which is proposed to be made in or for such district, * * * "

 Section 40–22–09 has expressly conferred upon the governing body of every city the legislative power and discretion to determine the size, form, and boundaries of an improvement district, and the judiciary will not interfere with the governing board's legislative determination of the size, form, and boundaries of an improvement district in the absence of jurisdictional

defects, fraud, or arbitrary action. The courts will not concern themselves with the wisdom of a municipal ordinance or resolution. For the courts so to do would invade the constitutional separation of powers and functions between the judiciary and the legislative branch of the government, to the extent that a portion of the legislative power of the State has been delegated to municipal corporations. Section 40–22–09 has expressly delegated such power. Boynton v. Board of City Com'rs of City of Minot, 1926, 54 N.D. 795, 798 and 799, 211 N.W. 441, 443; Reed v. City of Langdon, 1952, 78 N.D. 991, 996, 54 N.W.2d 148, 151; Merchants' National Bank of Fargo v. City of Devils Lake, 1919, 42 N.D. 445, 173 N.W. 748; State ex rel. Kettle River Quarries Co. v. Duis, 1908, 17 N.D. 319, 116 N.W. 751.

■ Section 40–22–09, N.D.C.C., supra, further provides: "Any improvement district created by a muncipality may embrace two or more separate property areas. * *" Plaintiffs contend that Avenue C, between Third Street and Ninth Street (six blocks), which is the street on which their property is situated, is a "separate property area," and therefore their written protest against the resolution of necessity is a legal bar against the City's proceeding further with the improvement project. See Section 40–22–17, N.D.C.C., which reads in part as follows:

"If, within thirty days after the first publication of the resolution declaring the necessity of an improvement project * * * the owners of any property within the improvement district file written protests with the city auditor * * * protesting against the adoption of said resolution, the governing body of the municipality, at its next meeting after the expiration of the time for filing such protests, shall hear and determine the sufficiency thereof."

The city commissioners found the protests to be insufficient. The city auditor had found that there were 254,500 square yards of assessable property in the entire district. The total number of square yards of protesting property was only 60,522, so the percentage of the property protesting out of the whole area was only 23.78 per cent. Then the City proceeded to accept the lowest bid and award a contract for the work to be done.

However, plaintiffs insist that their six blocks along Avenue C constitute a "separate property area" so that the property protesting was a majority of sixty-nine per cent, in which case it would be a legal bar against proceeding further with the improvement. Section 40–22–18, N.D.C.C., reads in part:

"If the governing body finds the protests to contain the names of the owners of a majority of the area of the property included within the improvement district the protests shall be a bar against proceeding further with the improvement project described in the plans and specifications. If the governing body finds the protests to contain the names of the owners of a majority of any separate property area included within the district, such protests shall be a bar against proceeding with the portion of such improvement project, the cost of which is to be assessed in whole or in part upon property within such [separate property] area, * * * If the protests are found to be insufficient or invalid, the governing body may cause the improvement to be made and may contract * * * for the construction thereof * * * and may levy and collect assessments therefor."

■ Plaintiffs define the term "separate property area" as "that portion of a proposed improvement which may be bounded and may be identified with reasonable certainty. It may be identified by ascertaining the location of the proposed improvement and the location of the protesting properties. Where more than one street

is included within a street-improvement district and each is identified by a specific name so as to be capable of location separate from the others, then such street and property which would be subject to assessment for the improvement thereon may be classified as a separate property area." Plaintiffs' definition of the term "separate property area" obviously is wrong because (1) Section 40–22–09 has expressly conferred upon the governing board of the city, rather than upon the property owners, the power and discretion to determine the size, form, and boundaries of an improvement district, and (2) both from the ordinary meaning of the word "separate" and from the context of the language in the statute, 40–22–09, it is clear that the term "separate property areas" means "geographically separate or noncontiguous areas." Since District No. 60 includes only property lying within a single, continuous, closed boundary, with streets and avenues that form a contiguous and interconnecting network, it is obvious that District No. 60 is one single area and does not embrace two or more separate property areas. Therefore, pursuant to the provisions of Section 40–22–18, supra, plaintiffs' written protests did not contain the required majority and consequently such protests were insufficient.

The city attorney's brief makes this comment on plaintiffs' proposed definition: " * * * if the property owner or group of property owners, such as these plaintiffs, can determine that any area is a separate property area, logically each property owner could determine that his own individual lot constituted such separate property area, or a group of one, two or three lots. Such a discretion and such a determination was not delegated by the statute [40–22–09] to the individual property owners but to the Board of City Commissioners exercising its legislative discretion, subject to judicial review for bad faith or fraud."

In March of 1959, the City, by Ordinance No. 1311, created a street-improvement district embracing sixteen blocks of residential area, including the six blocks on Avenue C from Third Street to Ninth Street. However, plaintiffs and other property owners of the district, being the owners of a majority of the area of the property included within the improvement district, filed written protests, as permitted by 40–22–17, supra, and consequently, under the provisions of 40–22–18, such protests constituted a legal bar against proceeding further with such 1959 improvement project.

■ The 1960 street-improvement district, No. 60, included the same sixteen blocks that had been in the 1959 district plus fourteen additional blocks on different streets, or twenty-eight blocks in all. Plaintiffs charge the governing body of the city with the fraudulent intention and purpose of including their property on Avenue C in the 1960 improvement district notwithstanding the valid protest against the 1959 resolution of necessity. However, plaintiffs have failed to prove their charge of "fraud." The governing body of the city created the street-improvement district as a matter of necessity and not as a matter of personal spite.

■ As previously stated, the only trees which will be removed by the City are those in the path of construction. However, plaintiffs demand injunctive relief against the removal of any of the trees from the right of way. A right of way for a city street is an easement, and an abutting lot owner, such as the plaintiffs herein, owns the fee to one-half of the street. The adjacent lot owner owns a fee in the half of the street which is contiguous to his property. Gram Construction Company v. Minneapolis, St. P. & S. Ste. M. R. Co., 1917, 36 N.D. 164, 172, 161 N.W. 732, 734. However, the City has certain powers and privileges incident to such right of way, including the right of the City to remove or trim trees planted or maintained by an abutting lot owner when it is reasonably necessary for improve-

ment of the street. Weibel v. City of Beatrice, Nebraska, 1956, 163 Neb. 183, 79 N.W.2d 67; Rich v. City of Minneapolis, 1887, 37 Minn. 423, 35 N.W. 2, 5 Am.St.Rep. 861.

■ The foundation of the power to lay a special assessment for a local improvement of any character, including the widening, paving, and otherwise improving a city street, is the benefit which the object of the assessment confers on the owner of the abutting property, or the owners of property in the assessment district, which is different from the general benefit which the owners enjoy in common with other inhabitants or citizens of the municipal corporation. The theory is, " * * * the owners do not, in fact, pay anything in excess of what they receive by reason of such improvement." Norwood v. Baker, 1898, 172 U.S. 269, 19 S.Ct. 187, 43 L.Ed. 443, 447; Webster v. City of Fargo, 1900, 9 N.D. 208, 82 N.W. 732, 56 L.R.A. 156, affirmed in 1901, 181 U.S. 394, 21 S.Ct. 623, 45 L.Ed. 912; wherein the North Dakota Supreme Court held: "In exercising the power of local assessment, the legislature is not limited to the actual increase in value of the property assessed, resulting from the local improvement. Rolph v. City of Fargo, 7 N.D. 640, 76 N.W. 242, 42 L.R.A. 646, followed." The United States Supreme Court, in affirming, held: " * * * we agree with the supreme court of North Dakota in holding that it is within the power of the legislature of the state to create special taxing districts, and to charge the cost of a local improvement, in whole or in part, upon the property in said district, either according to valuation or superficial area or frontage, and that it was not the intention of this court, in Norwood v. Baker, to hold otherwise." 21 S.Ct. 624, 45 L.Ed. 912, 914. See 14 McQuillin, Municipal Corporations, 3d Ed., Sec. 38.02.

■ Special assessments for the payment of local improvements are sustained under the exercise of the power of taxation. " * * * the foundation of the right to assess exists in the taxing power, and it is not necessary that in imposing an assessment there must be a hearing before a court provided by the law in order to give validity to such assessment." Ellison v. City of La Moure, 30 N.D. 43, 48, 151 N.W. 988, 989; 14 McQuillin, Municipal Corporations, 3d Ed., Sec. 38.01.

The North Dakota Legislature has enacted the following statutes, and others, vesting the board of city commissioners and the special-assessment commission with certain powers and authority: namely, Sections 40–22–15, 40–23–01, 40–23–04, 40–23–05, 40–23–07, 40–23–09, 40–23–10, 40–23–11, 40–23–12, 40–23–14, and 40–23–15, N.D.C.C., which provide in part as follow:

40–22–15: "After the plans, specifications, and estimates for an improvement have been filed and approved, the governing body of the municipality, by resolution, shall declare that it is necessary to make the improvements described therein."

40–23–01: "The executive officer of each municipality, when it shall be found necessary, shall appoint three reputable residents and freeholders of the municipality as members of a commission which shall be known as the special assessment commission."

40–23–04: "Each officer and employee of the municipality shall give to the special assessment commission such information, advice, and assistance as it may request."

40–23–05: "At any time after the contract and bond for any work for which a special assessment is required have been executed and approved by the governing body of the municipality and the total cost of such work shall have been estimated as nearly as practicable, the governing body may direct assessments to be levied for the payment of all or any part of such cost.

and the city auditor * * * shall notify the chairman of the special assessment commission and shall certify to him the items of the total cost thereof so far as the same have been ascertained. The chairman immediately shall call a meeting of the commission, which shall proceed as expeditiously as possible to make and return the special assessment as provided in this chapter."

40-23-07: "Whenever the commission is required to make any special assessment under the provisions of this title, the members thereof personally shall inspect any and all lots and parcels of land which may be subject to such special assessment and shall determine from such inspection the particular lots and parcels of land which, in the opinion of the commission, * * * will be especially benefited by the construction of the work for which such special assessment is to be made, and shall assess against each of such lots and parcels of land such sum, not exceeding the benefits, as shall be necessary to pay its just proportion of the total cost of such work, or of the part thereof which is to be paid by special assessment, including all expenses incurred in making such assessment and publishing necessary notices with reference thereto and the per diem of the commission."

40-23-09: "The commission shall make or cause to be made a complete list of the benefits and assessments setting forth each lot or tract of land assessed, the amount each lot or tract is benefited by the improvement, and the amount assessed against each. There shall be attached to the list of assessments a certificate signed by a majority of the members of the commission certifying that the same is a true and correct assessment of the property therein described to the best of their judgment, and stating the several items of expense included in the assessment."

40-23-10: "The commission shall cause the assessment list to be published once each week for two consecutive weeks in the official newspaper of the municipality, together with a notice of the time when and the place where the commission will meet to hear objections made to any assessment by any interested party, his agent, or attorney. The date set for such hearing shall be not less than fifteen days after the first publication of the notice."

40-23-11: "At the hearing, the commission may make such alterations in the assessments as in its opinion may be just or necessary to correct any error in the assessment list. The commission may increase or diminish any assessment as may be just and necessary to make the aggregate of all assessments equal to the total amount required to pay the entire cost of the work for which such assessments are made, or the part of such cost to be paid by special assessment. No assessment shall exceed the benefits as determined by the commission to the parcel of land assessed."

40-23-12: "The special assessment commission, after the hearing, shall confirm the list and attach thereto its further certificate certifying that the list is correct as confirmed by it. The commission thereafter shall file the assessment list in the office of the city auditor or village clerk, as the case may be."

40-23-14: "Prior to the meeting at which the governing body will act upon the assessment, any aggrieved person may appeal from the action of the special assessment commission by filing with the city auditor or village

clerk, as the case may be, a written notice of the appeal, stating therein the grounds upon which the appeal is based."

40–23–15: "At the regular meeting of the governing body at which the assessment list is to be acted upon, any person aggrieved by the determination of the special assessment commission in regard to any assessment who has appealed therefrom as provided in section 40–23–14 may appear before the governing body and present his reasons why the action of the commission should not be confirmed. The governing body shall hear and determine the appeals and objections and may increase or diminish any of such assessments as it may deem just, except that the aggregate amount of all the assessments returned by the commission shall not be changed and no assessments as adjusted shall exceed the benefits to the parcel of land on which it is assessed as determined. by the assessment commission."

In Ellison v. La Moure, supra, 1915, 30 N.D. 43, 50, 151 N.W. 988, 990, this court said:

"The special assessment commission is, in the first instance, vested with the power and authority to fix and determine, not only the benefits, but the amount of the assessment each property should be required to pay; and the power is reserved to the city council to review and correct the errors of judgment of the commission.

"The special assessment commission is expressly created a tribunal to assess the benefits resulting to the different tracts of land. And the amount of such benefit, if any, is a question of fact to be determined by such commission, subject to review by the city council in the manner provided by the statute."

In Boynton v. Board of City Com'rs of City of Minot, 1926, 54 N.D. 795, 211 N.W. 441, this court said:

[Syllabus by the Court] "The power to provide for public improvements and pay for the same through special assessments by means of special improvement districts is legislative, but may be delegated to a municipal corporation as a proper agency and instrument of the state."

84 C.J.S. Taxation § 349, p. 679 classifies the levy of a tax, including a local tax or special assessment, as a "legislative function," thus:

"The word 'levy' as applied to taxation * * * is the formal and official action of a legislative body invested with the power of taxation, whether national, state, or local, whereby it determines and declares that a tax of a certain amount, or of a certain percentage on value, shall be imposed on persons and property subject thereto. * * *

"*Legislative function.* The levy of a tax is not a judicial function, nor is it merely the ministerial action of ascertaining the rate per cent; but it is a legislative function to be exercised only by the state or some inferior political division to which the state has delegated the power."

48 Am.Jur. 588, Special or Local Assessments, section 29, reads in part as follows:

"Determination of Benefit.—The question of the existence and extent of special benefit resulting from a public improvement for which a special assessment is made is one of fact, legislative or administrative rather than judicial in character, and the determination of such question by the legislature or by the body authorized to act in the premises is conclusive on the property owners and on the courts, unless it is palpably arbitrary or

grossly unequal and confiscatory, in which case judicial relief may be had against its enforcement."

■ A judicial review of the work of the special-assessment commission may not be had until after its completion and until after it shall have made a complete list of the benefits and assessments, setting forth each lot or tract of land assessed, the amount each lot or tract is benefited by such improvement, and the amount assessed against each. The special-assessment commission then causes the assessment list to be published, together with notice of time when and place where it will hear objections to the same. Section 40–23–10, N.D. C.C.

At such hearing, the special-assessment commission may make such alterations in the assessments as, in its opinion, may be just or necessary to correct any errors in the assessment list, having the power to increase or lower any assessment to make the aggregate of all assessments equal to the amount required to pay the entire cost of the improvement. No assessments, however, shall exceed the benefits to the land assessed. Section 40–23–11, N.D.C.C.

After such hearing, the special-assessment commission shall confirm the list, shall certify it as correct, and shall file it with the city auditor or village clerk, as the case may be. Section 40–23–12, N.D. C.C.

In Hufford v. Flynn, 1921, 48 N.D. 33, 182 N.W. 941, 943 this court said:

"There can in no event be a judicial review of the acts of the commission until the commission has acted; * *"

After the special-assessment commission confirms the list, certifies it, and files it with the city auditor or village clerk, as the case may be, the auditor or clerk shall publish a notice in the official newspaper stating that the assessment list has been confirmed by the special-assessment commission, is filed in the office of the auditor or clerk, and is open for inspection. Section 40–23–13, N. D.C.C.

Such assessment list then shall be acted upon by the governing body at its first regular meeting which occurs more than fifteen days after the publication of such notice. Prior to the meeting at which the governing body acts upon the assessment, any person aggrieved may appeal from the action of the special-assessment commission, as provided by Section 40–23–14, N.D. C.C.

■ If no appeal is taken from the findings of the special-assessment commission as to the property benefited and the amount of benefit to each parcel or tract, and after the finding of such commission is confirmed by the governing board of the city, the determination of the commission as to such benefits is final and will not be disturbed by the courts in the absence of fraud or other grounds entitling the property owner to equitable relief. Hale v. City of Minot,. 52 N.D. 39, 201 N.W. 848; Reed v. City of Langdon, 78 N.D. 991, 54 N.W.2d 148.

Therefore, to review at this time the question of whether the plaintiffs' property would be benefited and the extent of such benefits, or to review the special assessments to be levied upon the plaintiffs' property, would be premature for the reason that the special-assessment commission has not yet acted. In other words, there can be no determination at this time as to whether the property of the plaintiffs will be benefited, and to what extent.

For reasons stated herein, the judgment of the district court is affirmed.

SATHRE, C. J., and MORRIS, STRUTZ and TEIGEN, JJ., concur.

Honorable THOMAS J. BURKE deeming himself disqualified did not participate; Honorable A. J. GRONNA, one of the Judges of the Fifth Judicial District, sitting in his stead.