Rose **PATTERSON** et al., Plaintiffs and Respondents,

v.

The **CITY OF BISMARCK**, a municipal corporation, et al., Defendants and Appellants.

Civ. No. 8866.

Supreme Court of North Dakota.

Oct. 24, 1973.

Rausch & Chapman, Bismarck, for plaintiffs and respondents.

John A. Zuger, City Atty., City of Bismarck, and Arthur B. Whitney, Minneapolis, Minn., for defendants and appellants.

RAY R. FRIEDERICH, District Judge.

This is an appeal from a judgment of the District Court of Burleigh County restraining the City of Bismarck from levying and collecting special assessments and for the refund of those assessments already paid under protest in connection with the construction and operation of a parking ramp in Parking Improvement District No. 17.

The case has previously been before this Court on limited issues, and a new trial was granted on all issues. See Patterson

v. City of Bismarck, 188 N.W.2d 734 (N. D.1971).

The facts and circumstances giving rise to the suit are as follows:

The Board of City Commissioners of Bismarck for many years prior to this action recognized a parking problem within the city, and in 1956 appointed a Parking Advisory Committee with instructions among other things to inventory and analyze the existing parking problem along with the economic impact of parking upon the city, and to suggest methods of acquiring and financing public parking facilities. This advisory committee in projecting the anticipated parking needs of the city recommended the acquisition of property for public parking at Sixth Street and Broadway and the use of the special assessment method as the only satisfactory means of acquiring and financing parking lots. Among its recommendations the committee stated:

"The lots already acquired adjacent to the central business area may be 'ramped' as the need materializes and the demand for parking increases to make this a practicality."

The concern of the city administration as it pertained to parking in the central downtown business section of Bismarck at about this time is further indicated by a revision of the zoning ordinance passed in July of 1954 which exempted from providing off-street parking, (1) any building replacing a building existing at the date of the ordinance, (2) any new building being constructed on vacant land, or (3) any building in which floor space was increased by any additions or structural alterations. The ordinance previously in effect and which governs all areas in the business and commercial district of Bismarck not exempted by this zoning ordinance requires off-street parking according to a formula outlined in the ordinance. The geographic area encompassed by the 1954 ordinance exempting certain areas

from furnishing off-street parking space includes what is now Parking Improvement District No. 17, and the ordinance provides that in this area parking will be provided by the City of Bismarck by eminent domain or other authorized legal means, and assessment made against the benefited property.

A traffic engineering study for the city requested in 1962 from a private consulting firm found the greatest traffic congestion and parking problem where Main, Broadway, and Thayer Avenues intersected Third, Fourth, Fifth, and Sixth Streets. To alleviate the traffic congestion this study recommended prohibition of parking for 30 to 40 feet from the crosswalks and approaches to some of these intersections.

A parking study by the same consulting firm in November of 1962 found the greatest parking problem at the intersection of Thayer Avenue and Fifth Street. They recommended a parking lot on the south side of Broadway between Fifth and Sixth Streets. Their findings as to the habits and preferences of people visiting the area were:

"Almost 50 percent of the people walked less than 100 feet. Only 2 percent of the people are required to walk over 800 feet. The clear implication is that any new parking facility would have to be located within 400 feet, and preferably within 200 feet, of the principal shopping and business destinations to attract any appreciable patronage."

The most comprehensive study of the problem in "downtown Bismarck" was compiled in 1968 by a committee of interested residents, officials of the city, and a firm of planning consultants. This study covered an area of 96 blocks considered the business and commercial area of Bismarck. It found the four blocks bounded by Third Street, Fifth Street, Broadway, and Main Avenue (largely within Parking Improvement District No. 17) to constitute almost 25 percent of the total taxable val-

uation of this area. As to parking problems it found:

1. "In the four central blocks [all within Parking Improvement District No. 17], only 81,000 sq. ft. is available on-street and off-street to serve more than 500,000 sq. ft. of floor area. Thus, the parking area for these four blocks is less than one-sixth the total floor area."

2. "Although the city has been active in providing additional off-street parking areas, serious deficiencies still exist around major traffic generators."

In its recommendations to the city administration the same committee stated:

"The downtown improvement plan suggests three principal locations for the development of further off-street parking: south of Thayer Avenue between 2nd Street and the alley between 3rd Street and 4th Street, north of Main Avenue between 2nd Street and the alley line between 3rd Street and 4th Street, and on the west side of 6th Street between Thayer Avenue and the alley between Broadway and Main Avenue. Each of these proposed locations might be purchased and developed in stages, probably beginning as open, off-street parking areas, and eventually being developed into multi-level parking garages. . . ."

In accordance with the information thus received and the recommendations made, the city administration proceeded to acquire the property on which the present parking ramp is constructed. The particular site, among others, was acquired by the formation of separate special improvement districts in 1963, 1964, and 1966. The 1963 district was larger in area than Parking Improvement District No. 17, but the area actually assessed was the same. The 1964 and 1966 districts comprised the same area as District No. 17.

The ordinance creating Parking Improvement District No. 17 was passed by the Board of City Commissioners of Bismarck in October of 1968. It comprises an area slightly over 10½ city blocks in the central business district of Bismarck and for all practical purposes is rectangular with the parking ramp or parkade, as it is referred to, located almost directly in the center. The problem areas for parking and traffic congestion pointed up in the studies and surveys heretofore referred to are either entirely or largely within the area comprising Parking Improvement District No. 17. The resolution declaring the necessity of the improvement adopted at the same time as the ordinance and stating the reason and nature of the improvement is as follows:

"It is hereby found, determined and declared that for the purpose of alleviating traffic congestion, preventing the development of blight and implementing orderly plans for urban development and urban renewal it is necessary that adequate and suitable space be reserved for parking facilities in the central business area of the City pursuant to and in accordance with the state policy and purpose set forth in Chapter 40–60 of the North Dakota Century Code. For this purpose the City has created parking improvement District No. 17, and determines that it is necessary to acquire, construct, improve and develop a parking ramp, including also space for commercial use within the limitations prescribed by said Chapter 40–60, and to devote to this purpose the land now owned by the City, situated in Block 46 of the Original Plat of Bismarck, all in accordance with and as more fully described in the plans and specifications therefor which, together with an estimate of the cost thereof, have been prepared by the Architect for the City and approved by this Board and are now on file in the office of the City Auditor, open to inspection by all persons interested."

The resolution in its entirety was published in the Bismarck Tribune in the issues of October 10 and 17, 1968, and described the property to be included in the district. It also stated that the cost of the

improvement would be specially assessed against the respective lots, tracts, and parcels of land lying within the improvement district in an amount proportionate to and not exceeding the benefit derived. It further described the method of funding and gave notice that on November 12, 1968, the Board of City Commissioners would meet at the City Hall at 4:30 o'clock P.M. to determine the sufficiency of written protests from owners of property within the district.

In the same resolution the City Auditor was directed to advertise for bids for the work and materials required for the construction of the improvement with the bids to be opened at a specified time but final action to be deferred until after the date fixed for hearing of protests. No protest was filed by anyone on any part of the commissioners' proposed action.

It should be pointed out that previous to the formal action of the Bismarck City Commission on Parking Improvement District No. 17 a private corporation known as V & S Enterprises had been given an option on the parkade site for the construction of a parking ramp. During the period of the option this corporation had plans and specifications for a parking facility prepared by an architectural firm. Being either unable or unwilling to proceed with the proposed structure at the time the option expired, V & S Enterprises pursued negotiations with the city for the purchase of the architectural plans and specifications. The purchase price was agreed upon after the plans and specifications were appraised for the city by a reputable consulting firm and revised in accordance with the recommendations of the consultants. Bids for the construction of the parking ramp according to the drawings and specifications with related facilities were advertised and awarded to the best bidders at a total cost of $1,314,337. The minutes of the November 12, 1968 meeting of the City Commissioners show the bids received and accepted and the resolution authorizing the construction of the improvement and the assessment to proceed.

Since the proposed structure was to contain both commercial and parking space the city advertised for bids for the leasing of the parking concession and of the commercial or retail store and office space of the multi-story structure. The highest and best bids for the parking ramp and the commercial or retail store and office space, on long-term leases with option to renew, were accepted. All of these proceedings were completed without protest again by any of the property owners.

The next series of events and the one probably being challenged more than any other concerns the distribution of the assessment among the various real properties in the assessment district.

The details of this task were assigned to the Special Assessment Commission as prescribed in Chapter 40–23, N.D.C.C. This commission proceeded to determine for each tract within the district the amount benefited and the amount assessed as provided in Section 40–23–07, N.D.C.C. They did this by an inspection collectively and individually in which they toured the various property within the district. Each of the commission members did not personally enter every business place, but those not personally entered they considered themselves sufficiently familiar with as long-time residents and businessmen in the area to make the evaluation. They determined first that each parcel within the district was benefited by the parking ramp to some degree and, secondly, that the off-street city ordinance parking formula in effect in the other areas of the city should be used as the guideline in arriving at the benefit and assessment attributable to each lot, tract, or parcel. In considering the benefits derived from the improvement they also took into account the benefit of restoring taxable property to the tax rolls by way of the commercial store and office space.

The administrative assistant of the commission, a man with many years of experience in computing and spreading special

assessments, was assigned by the commission to obtain the facts and information to be used in its determination of benefits and assessments. This was done by first preparing a detailed plat of each tract or parcel within the district. According to the building plans or building permits on file, the administrative assistant checked the number of parking spaces which were actually provided at the time by each property owner. He counted these spaces personally, if marked or measured, and computed at 300 square feet per car space the number of such spaces if they were not marked. He determined if the space was reserved for any purpose or available as public off-street parking. With the information thus obtained through the administrative assistant, together with their own knowledge gained from the examination of the area, the commission determined the total number of parking spaces which would be required for a particular tract or parcel by the ordinance formula in effect in that part of the business and commercial district of Bismarck not within Parking Improvement District No. 17. Credit was given to each property owner to the extent of off-street parking available to customers but was not extended for parking paid for by owners through Park & Shop, stamps, or other such method. The commission then divided the total number of required off-street parking spaces into the amount of total benefit which the parking would provide the area as previously determined to arrive at a per-unit benefit from each public off-street parking space. They arrived at a figure of $750 resulting benefit to the property for each parking space. They then divided the total number of the required parking spaces in the district by the cost of the parking facility as certified to them by the City Auditor and arrived at a figure of $498 per space.

As has already been stated, to arrive at the number of off-street parking spaces needed by each individual tract or parcel of property the commission applied the ordinance formula which governed in the

other areas of the business and commercial district of Bismarck not exempt from furnishing off-street parking. A partial table of required off-street parking under this ordinance reads as follows:

| | |
|---|---|
| "Hotels, including clubs. | One space for each two guest rooms (any additional services provided, barber shops, etc. require additional parking)." |
| "Theaters. | One space for each ten seats for patron use." |
| "Restaurants, including bars, taverns, night clubs, lunch counters, diners, and all other eating or drinking establishments. | One space for each four seats for patron use." |
| "Medical clinics, including doctors', dentists', and drugless physicians' offices. | Three spaces for each doctor using office plus one space for each two employees including nurses." |
| "Retail establishments including personal service shops, equipment or repair shops. | CA or CB Commercial District—one space for each 200 sq. ft. of floor area on ground floor, plus one space for each 400 sq. ft. of floor area in a basement or story above the ground floor." |
| "Office building, including commercial, governmental and professional buildings. | One space for each 400 sq. ft. of floor area." |

On the basis of the parking spaces needed for each property owner according to the formula, multiplied by the cost per space as determined, less credit for off-street parking furnished by a respective tract or parcel, if any, the amount of the assessment was determined.

The Special Assessment Commission then compiled the assessment list, published it in the Bismarck Tribune along with a date for hearing objections to the amount assessed against respective lots, tracts, or parcels, all as provided in Chapter 40–23, N.D.C.C. This hearing before the Special Assessment Commission was the first at which objections were made by any of the property owners who are parties to this action. It should be pointed out that by this time construction of the parking ramp was nearly completed. The objections filed were as to the size of the improvement district, the necessity of the improvement dis-

trict, the amount of some individual assessments, the method used in determining the assessment, and the type or nature of the business which the Special Assessment Commission had considered as being conducted in or upon a tract or parcel. After all objections were heard, assessments on the property of some of the persons objecting were revised and the assessment list certified as corrected to the Board of City Commissioners. The commissioners on examination of the list did not confirm it, but referred it back to the Special Assessment Commission for study and additional hearings.

Pursuant to the directive from the City Commission, the Special Assessment Commission met and instructed the City Auditor to notify by letter all persons who objected to their particular assessment at the previous meeting and to appear at a specified time and place to provide additional information relative to the determination of benefits and special assessments and to file such additional information with the City Auditor prior to a specified date. At the hearing the commission reviewed the petitions and communications filed by property owners and its Findings and Conclusions were as follows:

"1. That the Special Assessment Commission is without authority to change the district boundaries in and for Parking Improvement District No. 17.

"2. That the petition and communication filed by LeRoy Walker is for himself as a tenant and not as a property owner.

"3. That the authority for the improvement provided in and for Parking Improvement District No. 17 is noted in Chapter 40–60 and Chapters 40–22, 40–23 and as provided elsewhere in Title 40 of the North Dakota Century Code.

"4. That answers were provided to property owners appearing in the hearing held by the Special Assessment Commission and the filings made by property owners are repetitious and without proper foundation.

"5. That no showing has been filed or shown by the written instruments filed or at the hearing held that the assessments were not valid or equitable."

The commission found no basis for modifying its original computation as corrected and therefore certified the list as originally confirmed at its earlier meeting.

Notice was next given by publication that any property owner might appeal from the action taken by the Special Assessment Commission and be heard before the Board of City Commissioners at a specified time and place. The Board of City Commissioners heard in substance the same objections based on substantially the same grounds by the same property owners who were heard by the Special Assessment Commission. They made no changes and confirmed the list as certified to them by the Special Assessment Commission.

The minutes of the Board of City Commissioners show the proceedings for the issuance and sale of temporary warrants and later special improvement bonds which were refunded simultaneously by refunding improvement bonds. The original resolution of necessity provided that the special assessment against the property within the improvement district would be reduced annually or canceled by revenue received from service charges or lease income from the operation of the improvement by the city or its lessees. It provided that the parking utility revenues pledged for the payment of the warrants be appropriated to a special fund for the payment of the bonds. Since the legality of the funding procedure followed by the city is not challenged, a detailed discussion of those proceedings is omitted here. Also, our decision in Patterson v. City of Bismarck, *supra*, has to a large measure decided the legality of the funding procedure.

The parkade located at the intersection of Fifth Street and Broadway was com-

pleted in June of 1970. The cost apportioned to the commercial space is $519,558.16 and for the parking space is $919,362.91. It accommodates 317 vehicles while the lot on which it is located held 69. All but one business in the improvement district is within two city blocks of the parkade.

The trial court concluded that actions and proceedings of the city in the construction of the parkade and the imposition of special assessments against the properties of the plaintiffs were arbitrary, capricious, void and contrary to the statutes and in violation of the Constitution of North Dakota. It restrained and enjoined the city from levying and collecting the special assessments and ordered an immediate return of all monies paid under protest by the plaintiffs.

In essence, the trial court found:

1. Notice relating to the special assessments within the district was given only by publication and not by personal service.

2. The site occupied by the parkade was used partially or entirely as a surface parking area and was acquired under a resolution of necessity for "surface meter parking" and that growth and size of the city could not economically justify a multi-level parking ramp.

3. The geographic area of the district as established by the City Commissioners being only a part of the commercial and business district of Bismarck was arbitrary, capricious, and unlawful.

4. It was arbitrary and inflexible for the Special Assessment Commission to apply a formula prescribed by an ordinance intended to govern surface parking and not ramp parking.

5. The Special Assessment Commission did not personally inspect the area and further delegated its power and duties to an administrative assistant.

6. Section 185 of the North Dakota Constitution prohibits construction of a commercial parkade through the special assessment method.

7. The parkade contains commercial retail area in which business is conducted in competition with business in the property being assessed.

8. By purchasing the plans and specifications for the parkade from V & S Enterprises, a private corporation, and subsequently leasing the commercial retail area to this corporation the city in fact expended city funds for the benefit of private investors.

The appellants have set out 22 separate specifications in which they allege error in the Findings and Conclusions or in the admission of evidence by the trial court. For purposes of this opinion these specifications are consolidated into related subjects. Our decision on some will obviate the decision on others.

We choose to examine first the issue of whether the procedure by the city met all prerequisites under the due process clause of the Constitution as it might affect property owners who are parties to this appeal.

The preliminary passage of an ordinance and proceedings such as the resolution of necessity for an assessment in the formation of a special assessment district lay the foundation for such a district and constructive notice by publication of the proceedings is sufficient under the due process clause of the Fourteenth Amendment to the United States Constitution. Fisher v. City of Minot, 188 N.W.2d 745 (N.D.1971); Hoffman v. City of Red Bluff, 63 Cal.2d 584, 47 Cal.Rptr. 553, 407 P.2d 857 (1965); Roznos v. Town of Slater, 254 Iowa 77, 116 N.W.2d 471 (1962). See also, Utley v. City of St. Petersburg, 292 U.S. 106, 54 S.Ct. 593, 78 L.Ed. 1155, rehearing denied 292 U.S. 604, 54 S.Ct. 712, 78 L.Ed. 1466 (1934); Chicago, M., St. P. & P. R. Co. v. Risty, 276 U.S. 567, 48 S.Ct. 396, 72 L.Ed. 703 (1928).

In *Fisher,* 188 N.W.2d, at 751, this Court held:

"In the instant case, at this stage of the proceedings for the establishment of Parking Improvement District No. 4, the resolution of necessity was published pursuant to § 40–22–15 N.D.C.C., and the personal rights or the property rights of Fisher and Van de Streek have not been in any way jeopardized, nor have they been deprived of any constitutional rights . . . ."

At some point in the process before the property owner's liability for a special assessment becomes finally established, due process requires that the owner be given notice and the opportunity to object to the proposed assessment of the property. Little Sister Coal Corporation v. Dawson, 45 Ill.2d 342, 259 N.E.2d 35 (1970); Brown v. City of Salem, 251 Or. 150, 444 P.2d 936 (1968); County of Riverside v. Whitlock, 22 Cal.App.3d 863, 99 Cal.Rptr. 710 (1972); Great Northern Railway Co. v. Roosevelt County, 134 Mont. 355, 332 P.2d 501 (1958). Sections 40–23–10, 40–23–13, 40–23–14 and 40–23–15 of the North Dakota Century Code are consistent with the foregoing general statement. This is for the obvious reason that any such assessment for the completed project imposed by the district becomes a lien on the affected property, and the property is subject to foreclosure and loss for nonpayment of assessment (Secs. 40–24–01 and 40–25–01, N. D.C.C.). Due process would require knowledge and an opportunity to be heard on a proceeding with such dire consequences (North Dakota Constitution, Sec. 13).

The trial court in its decision relied heavily upon a Minnesota case, Meadowbrook Manor, Inc. v. City of St. Louis Park, 258 Minn. 266, 104 N.W.2d 540 (1960), and upon a Wisconsin case, Wisconsin Electric Power Co. v. City of Milwaukee, 275 Wis. 121, 81 N.W.2d 298 (1957), as authority to the effect that something more than constructive notice is necessary to fulfill the prerequisite of due process.

In the *Meadowbrook Manor* case the property owner was a non-resident corporate owner of an apartment house some two miles from where the special assessment project, a storm sewer outlet, was being constructed. It was stated that due process entitled the property owner to reasonable notice and hearing before his property could be subjected to the lien of a special assessment. Further emphasis was given to the fact that, " 'no officer, director, agent or employee of petitioner had actual knowledge of the levy or intended levy . . . or of the said assessment hearing . . . or of the adoption and approval of said assessments . . . or of the construction of said Sanitary Sewer Improvement . . . until receipt . . . of the regular statement for taxes and special assessments . . . .' " 104 N.W.2d 540 at 543.

The fact that the improvement was not made in the vicinity of the taxpayer's property or where it maintained its office was specifically emphasized in the opinion. What constitutes reasonable notice might vary depending upon circumstances in the case. The clear import of the decision is that different facts might well result in a different decision. The *City of Milwaukee* case is based upon a similar set of facts. Both of these cases rely upon two earlier United States Supreme Court decisions, Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), and Walker v. City of Hutchinson, 352 U.S. 112, 77 S.Ct. 200, 1 L.Ed.2d 178 (1956), decisions which this Court also considered in Fisher v. City of Minot, *supra.*

In Parking Improvement District No. 17 the property affected is not two miles but within two blocks of the improvement. To conclude that the property owners did not have actual knowledge of the proposed improvement is unrealistic, for why else would they have appeared at the hearing

before the Special Assessment Commission in person or by attorney, or have appealed from the determination of that commission to the Board of City Commissioners, or ultimately instituted the action before the District Court.

In a special assessment proceeding notice by mail or personal notice is not a prerequisite to due process per se. Actual notice of a hearing in addition to constructive notice is sufficient. Murphy v. Montgomery County, 267 Md. 224, 297 A. 2d 249 (1972). Furthermore, the opportunity to be heard in a judicial proceeding constitutes due process of law. As a general rule the Court will not interfere with the taxation or assessment law as violative of the Fourteenth Amendment unless the action of the taxing authority has been palpably arbitrary or grossly unequal in its application to the property owners concerned. Mount Saint Mary's Cemetery Assn. v. Mullins, 248 U.S. 501, 39 S.Ct. 173, 63 L.Ed. 383 (1919). Pittsburgh, C., C. & St. L. Ry. Co. v. Board of Public Works, 172 U.S. 32, 19 S.Ct. 90, 43 L.Ed. 354 (1898).

In Barnes v. Cass County, 59 N.D. 135, 228 N.W. 839 (1929), at page 843, the general position of this Court was stated:

"This court has consistently held that, where jurisdiction has been conferred upon the board, parties cannot be heard to assert invalidity of special assessments, in the absence of fraud, and the courts do not inquire into the correctness of the judgment of the board as to alleged benefits in the absence of fraud or the manifest abuse of discretion. [Citing cases] . . .

"This rule has special force when the parties stand by and see the work going on, but make no protest until long after the work is completed. Such parties know the work cannot be done without the contractor being paid for it, and that the only way in which he can be paid is by assessment of the lands. . . ."

As has been stated, each of the property owners in this appeal appeared either in person or by attorney before the Special Assessment Commission, the Board of City Commissioners, or at the trial before the District Court. They were questioned at the trial whether they had anything further to submit concerning the assessment, or which would show a discrepancy in the findings and determinations of either the Special Assessment Commission or the Board of City Commissioners. We have examined the record and find no evidence to show that the action or the determination of either of these two boards was arbitrary or capricious. The objections voiced by the appellants were directed at the size of the area assessed, the necessity of the improvement, and the excessive cost of it.

The rule of law stated by this Court in Reed v. City of Langdon, 78 N.D. 991, 54 N.W.2d 148 (1952), was again restated in Soo Line Railroad Co. v. City of Wilton, 172 N.W.2d 74, 79 (N.D.1969), to the effect:

"'Generally, all presumptions are in favor of the validity of assessments for local improvements and the burden is on persons attacking the validity of assessments to show that they are invalid.'"

The burden under these circumstances is an exceedingly heavy one. McQuillin, Municipal Corporations, Vol. 14, Sec. 38.183, at 452.

We direct our attention now to the action of the Special Assessment Board. To a large measure the objections to the manner and the sufficiency with which the Special Assessment Commission ascertained the benefits and the assessments in this case were also raised in an earlier North Dakota case, Hale v. City of Minot, 52 N.D. 39, 201 N.W. 848 (1924). We stated our position in that case, at 850, as follows:

"The amount of the assessment against each lot was determined in an amount

equal to that proportion of the total cost and expense of the improvement which the footage and area of such lot bore to the total footage and area of all the lots in the district. The benefits were fixed at an amount equal to 125 per cent. of the cost of the improvement distributed as above indicated. The only personal inspection given by the commission, as such, was by riding up and down the various streets in an automobile, whence they viewed the whole district, taking, as they said, a birdseye view of it. This required something less than an hour in time. It appears, however, that some of the commissioners lived in the district and near to the lots in question. The testimony is that the commissioners determined the benefits according to their best judgment, basing that judgment upon such knowledge as they had and obtained in the manner above described, and that, so far as they were able to determine, the lots were benefited in the amounts thus found by them.

"As we have stated above, the law is well established that, if an assessment board exercises its judgment in determining benefits, any errors of judgment that it may have been guilty of may not be corrected by a resort to a court of equity. If there was an exercise of judgment, that judgment is final on the question of benefits, except as relief may be had on appeal. In this case it seems to us that the plaintiff has failed to establish, as he was bound to do, that there was not an exercise of judgment on the part of the commission. The mere fact that in exercising that judgment the commissioners took into consideration the report of the city engineer as to the topography of the lots in question, or that they, in exercising that judgment, took into consideration the front footage of the various lots or the areas thereof, does not establish the contention of the plaintiff. It seems to us they would have been derelict to their duty had they not done so. The improvement was a storm sewer and, necessarily, the amount

of flood waters to be carried off depended upon the areas of the various lots. Surely, it rains alike upon them all, and the storm waters to be carried from each must be proportionate to the areas of each. It is true that the statute, section 3726, C.L.1913, supra, requires the assessments to be levied in proportion to the benefits conferred and forbids a levy according to front footage or area. Nevertheless, it does not forbid the commission to consider front footage or area as elements in determining the benefits. See Robertson Lumber Co. v. Grand Forks, supra [27 N.D. 556, 147 N.W. 249]. And while the same statute, section 3726, supra, requires the commission to personally inspect any and all lots subject to the assessment, it does not specify just what shall be done in the way of such inspection. We believe that what the statute contemplates in this respect is that the commission shall have a personal knowledge of the physical characteristics and conformation of the property; that such knowledge must be gained by the members of the commission by a view of the property; that it is immaterial when or how such knowledge be acquired if the members, in fact, have such personal knowledge. The purpose of the statute is met if they have such knowledge of the physical property based on what they themselves have seen, and not on the report of others. Tested in this way, it seems to us that, so far as appears from the record in this case, the requirements of the statute were complied with. The commissioners overlooked the whole area. They saw the various lots. Some of them lived adjacent to and must have been intimately acquainted with the lots here in question. Minot is not a city of great size, and it is fair to assume that all of them were well acquainted with the whole district. Had they walked around and over every lot and climbed every hill on the property, we doubt that they would have increased their knowledge. Surely, the statute does not require the commission-

ers to be engineers and make exact measurements with level and chain.

.　.　.　.　.　.

"It seems to us that it is humanly impossible to do exact justice in determining benefits. The best that can be expected is a reasonable approximation to equality. And thus the matter is left to the judgment and discretion of a local tribunal, which must inspect all the lands in the district and which has knowledge that cannot be gained from the testimony of witnesses or by reading a cold record. . . ."

Neither does the evidence substantiate a finding that no benefits were derived to the property owners of Parking Improvement District No. 17 from the commercial or rental space as well as the off-street parking. We have examined the authorities cited us by the respondents in support of their claim, particularly the case of Ruel v. Rapid City, 84 S.D. 79, 167 N.W.2d 541 (1969). The purpose and objective in a public parking ramp with associated commercial and office space are quite different from those of an auditorium or a library. The facilities are built to meet different needs and for use under totally different circumstances. Today's retail customer demands a choice of merchandise and of shopping outlets. To deplete large sections of a downtown shopping area for surface parking is simply providing one means of attracting customers at the expense of another. When the decision in Northern Pacific Railway Co. v. City of Grand Forks, 73 N.W.2d 348, 350 (N.D.1955), was rendered by this Court, Judge Burke wrote:

"In recent years there has been a trend toward a decentralization, evidenced by the removal of many businesses from congested areas to outlying districts where parking lots for customers were available. It is generally aknowledged and logically so, that the provision of parking space in the vicinity of a congested mercantile area, by making it conveniently accessible to trade, tends to re-

verse this trend and thus stabilize business in the area. This is a special benefit sufficient to justify special assessments. [Citing cases]."

What in 1955 at the time of that decision was a trend has in 1973 become a torrent. Although parking is a major factor responsible for the popularity and growth of shopping centers, it is not the only reason. The fact that many stores, even competing ones, are in close proximity to each other is at least another reason for attracting the shopper. If the congested downtown business section of any large city is to survive, then parking along with other demands of the modern shopper must be recognized. A city administration which refused or failed to recognize this fact or failed to take appropriate remedial steps would be derelict in its duty.

We have previously outlined the deliberate and painstaking process by which the Special Assessment Commission professed to determine the benefits and the assessments of each lot, tract, or parcel within this assessment district. It would be difficult to outline a more conscientious or diligent course of procedure to ascertain these benefits or to spread the assessments than the one used by the commission.

That the commission might avail itself of the expertise of persons trained and experienced in this field seems to us to be suggested in Section 40–23–09, N.D.C.C., for it states in part:

"The Commission shall make or cause to be made a complete list of the benefits . . ." [Emphasis added.]

To us this language clearly anticipates that assistance would be used in compiling statistical information necessary to arrive at a reasonable and equitable conclusion in such a complicated process. Had the commission failed to use or to avail itself of this technical help it might well have been criticized. In the course of carrying out the directive of the statute and the City Commission, the Special Assessment Commis-

sion determined to use the off-street parking formula as a guideline. The record is void of any proof that the application of this formula was not equally as fair and uniform for a multi-level parking ramp as when applied to surface parking. What must not be overlooked is that any formula or rule of thumb which the commission might adopt in ascertaining benefits and assessments among the property owners of Parking Improvement District No. 17 would also have to be fair as to property owners in the major business and commercial district of Bismarck not within District No. 17. If all property owners in the other sections of the business district are forced to comply with a building and zoning ordinance which requires certain off-street parking based upon the size and type of business being conducted upon a particular lot, tract, or parcel, why should not the same or a similar formula be applicable to the property owners within District No. 17? Only if the application of the off-street formula results in an unjust or unfair distribution of the assessment is it inappropriate. No such evidence is contained in the record.

Contrary to the finding of the trial court, we sense a particular effort on the part of the Special Assessment Commission as well as the city commissioners to allow all property owners the opportunity to be heard. The same can be said for their efforts to arrive at a fair and equitable assessment among those property owners.

We consider next the constitutional questions inherent in the construction of a combined parking and commercial facility along with related issues.

▆ The pertinent sections of the North Dakota Constitution which are brought into this issue are Section 20 and Section 185. They are as follows:

"Section 20. No special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the legislative assembly; nor shall any citizen or class of citizens be grant-

ed privileges or immunities which upon the same terms shall not be granted to all citizens."

"Section 185. The state, any county or city may make internal improvements and may engage in any industry, enterprise or business, not prohibited by article XX of the constitution, but neither the state nor any political subdivision thereof shall otherwise loan or give its credit or make donations to or in aid of any individual, association or corporation . . ."

A multi-level parking ramp with rentable commercial space is an uncommon structure in North Dakota. When such a structure is financed by special assessment the respondents claim it constitutes lending the credit and borrowing power of the city to individuals, associations or corporations contrary to Section 185 of the North Dakota Constitution.

We have on a number of occasions been called upon to interpret this section of the Constitution in the light of legislative attempts towards promoting industrial development. The resolution of necessity for the parkade includes the language:

" . . . for the purpose of alleviating traffic congestion, preventing the development of blight and implementing orderly plans for urban development and urban renewal . . ."

The purposes stated are in accordance with Section 40–60–01, N.D.C.C., and the legal authority to include rentable commercial space within the parkade is premised upon this section of the statute.

Although considering Chapter 40–57, N.D.C.C., rather than Chapter 40–60, N.D.C.C., this Court in Gripentrog v. City of Wahpeton, 126 N.W.2d 230 (N.D.1964), thoroughly reviewed an analogous issue and at pages 237 and 238 reached the following conclusion:

"Section 185 does not prohibit the making of loans or giving of credit or

making donations in connection with a city's engaging in any industry, enterprise, or business except engaging in liquor traffic. What it does prohibit is for a city 'otherwise' to make loans or give its credit or make donations. In other words, making loans or giving credit may be done in connection with a city's engaging in any permissible industry, enterprise, or business, but not otherwise.

"As we said in Northwestern Bell Telephone Co. v. Wentz (N.D.), 103 N. W.2d 245, it is common knowledge that no one can successfully engage in an industry, enterprise, or business without in some manner being involved in lending, the giving of credit, or the making of donations. Surely the framers of Section 185 of our Constitution would not have granted to the State and to any county or city the power to engage in industry, enterprise, or business and then have denied them the right to make loans or give credit in connection with the operation of such industry, enterprise, or business."

We view the constitutional question less critical in the case here under consideration than the one presented in the *Gripentrog* case. Certainly providing facilities within the business district being reconstructed for retail and commercial enterprise is more closely identified with the functions of a prosperous city than the operation of a sugar processing plant. Urban renewal with its association of social and economic evil in a deteriorating and congested section of a city is a relatively recent concept. The North Dakota Legislature in enacting Chapter 40–60, N.D.C. C., was keenly aware of this, since its policy statement in section 40–60–01, N.D.C.C., is directed at precisely the problem which confronted the Bismarck City Commission. The statute is so pertinent that reciting it verbatim is justified:

"40–60–01. Reservation of areas for parking.—To alleviate traffic congestion in municipalities, prevent the development of blight, and implement orderly plans for urban development and urban renewal, it is necessary that adequate and suitable space be reserved, particularly in central business areas, for parking facilities; which phrase is defined to include, but without limitation, all off-street lots, sites, parking meters and other control devices, garages, ramps and other structures and accessories, both above and below ground, which are used or useful for the parking, delivery, fueling and servicing of automobiles and other motor vehicles, the collection of charges therefor, and the convenience of the patrons of the facilities. The withdrawal of a disproportionate amount of land for this purpose from use for commercial development and from the tax base of municipalities is undesirable and can be avoided, when the growth of business areas makes it economically feasible, by the construction of multi-level parking ramps and garages, and by making the space above, below or adjacent thereto available for commercial development and use. It is the policy and purpose of the state to authorize and encourage municipal action, and cooperation of municipalities with public and private persons, firms and corporations, in the acquisition, construction, improvement, development, extension, financing, operation, maintenance and leasing of parking facilities, and of commercially usable space therein and adjacent thereto for the purposes and by the methods described in section 40–60–02."

In no way can we reconcile the legislative policy expressed in the foregoing statute with the language of this Court contained in the case of Manning v. City of Devils Lake, 13 N.D. 47, 99 N.W. 51 (1904), cited by the respondents, and we make no attempt to. Suffice it to say that the very same reasons why parking should be by ramp rather than surface parking are equally as valid in justifying commercial space to be included in the parking

ramp. In conjunction with the discussion previously of benefits versus assessments, we have already pointed out the necessity for the inner city to meet the competition of the modern shopping center. The precise issue raised here was also raised in the case of City of Fargo v. Fahrlander, 199 N.W.2d 30 (N.D.1972). We dismissed the contention there on the basis of our opinion in Ferch v. Housing Authority of Cass County, 79 N.D. 764, 59 N.W.2d 849 (1953), where it is stated at 861:

"It has been held that governmental competition with owners of private business does not constitute legal damage even though it may injure their business. Neither the federal nor state Constitution grants any right to plaintiff to be free from competition."

Nothing to the contrary has been shown by the property owners in this case which would prove the City Commission either in violation of statutory authority or without justifiable reason for its action which we find consistent both with the interpretation of this Court placed upon the appropriate constitutional provisions and the legislative intent in the statutes.

Did the purchase of the plans and specifications from V & S Enterprises, Inc., and the subsequent leasing of the commercial space to this corporation constitute spending public money in aid of a private corporation?

Although the trial court found that the action of the City Commission in this respect amounted to spending city funds in aid of a private corporation, we cannot agree. We have reviewed the testimony in the record and the evidence does not substantiate such a finding. The purchase of the plans and specifications was consummated only after their value had been carefully ascertained by a competent appraisal. Not only was an appraised value placed upon the plans and specifications by an independent consulting firm, but as has been pointed out previously, this firm recommended that upon certain modifications the plans be purchased at the appraised value.

Totally separate and apart from the purchase of the plans and specifications by the city was the lease of the commercial retail and office space. Whether by coincidence or because of prior experience, knowledge, or interest in the parkade, V & S Enterprises, Inc., was the highest and best bidder for this long-term lease at a public and competitive bidding. There is no evidence that the price paid by the city was excessive nor that the lease to V & S Enterprises, Inc., was a special bargain. We fail to see how the prior interest by V & S Enterprises, Inc., in this venture and their subsequent successful bid on the commercial retail and office space standing alone can be interpreted as expending city funds in aid of a private corporation.

Our discussion relating to constitutional due process has already touched upon the purpose for which the special assessment was levied and the geographic area or size it included. Section 40–60–01, N.D.C.C., specifically authorizes municipalities to construct multi-level parking ramps and garages when the governing board deems it necessary and advisable. The justification for, and the size of, the improvement district for this purpose is peculiarly within the judgment and discretion of that board. Whether action of a city commission was arbitrary in fixing the size and form of a special assessment district was before this Court in the recent case of Chernick v. City of Grand Forks [210 N.W.2d 73 (N.D.1973)]. The answer was squarely based upon the statute.

Section 40–22–09, N.D.C.C., provides, in part:

". . . Each improvement district shall be of such size and form as to include all properties which in the judgment of the governing body, after consultation with the engineer planning the improvement, will be benefited by the

construction of the improvement project . . . ” [Emphasis supplied.]

See also: Murphy v. City of Bismarck, 109 N.W.2d 635 (N.D.1961).

The extent and the circumstances under which this Court will review the action of the governing body as stated in Soo Line Railroad Co. v. City of Wilton, *supra,* were again restated in the *Chernick* case. The reasoning set forth in these cases applies equally to the case here under consideration.

We believe that the special assessment against the property in Parking Improvement District No. 17 has met the prerequisites so as to conform to the statutes in that:

1. The improvement constitutes a special benefit to each lot, tract, or parcel of land within the district, both in providing off-street parking and in developing and improving the economic base of the area.

2. The assessment is based upon a formula which takes into account the proportionate needs of each lot, tract, or parcel, the existing parking provided by that lot, tract, or parcel and the nature and size of the business being conducted thereon.

3. The assessment against each lot, tract, or parcel is not in excess of the benefit as determined by an impartial administrative agency whose action we do not find as being in violation of constitutional due process or arbitrary, unreasonable, or mistaken as a matter of law.

We adhere to the position stated in United Public School District No. 7 v. City of Burlington, 196 N.W.2d 65 (N.D.1972), and cases cited at 67:

“ ‘. . . this court is bound by the rule that when there is substantial evidence to support the decision of the special assessment commission, which is shown not to be invalid as a result of fraud or mistake, or by some defect in the proceeding which would render the special assessment invalid, the decision of the special assessment commission as confirmed by the city governing body must be affirmed.’ ”

The judgment of the trial court is reversed and the proceedings and the special assessment based thereon are in all things confirmed.

ERICKSTAD, C. J., and TEIGEN, KNUDSON and VOGEL, JJ., concur.

WM. L. PAULSON, J., deeming himself disqualified, did not participate; RAY R. FRIEDERICH, Judge of the Second Judicial District, sitting in his place.

VOGEL, J., not being a member of the Court at the time of submission of this case, participated on the briefs filed.