**CLOVERDALE FOODS COMPANY, Plaintiff and Appellant,**

v.

**CITY OF MANDAN, Defendant and Appellee.**

Civ. No. 10707.

Supreme Court of North Dakota.

March 13, 1985.

Arlen M. Ruff, of Kelsch, Kelsch, Bennett, Ruff & Austin, Mandan, for plaintiff and appellant.

Richard P. Gallagher, City Atty., Mandan, for defendant and appellee.

VANDE WALLE, Justice.

Cloverdale Foods Company (hereinafter Cloverdale) appealed from the judgment of the district court of Morton County dismissing its action to enjoin the collection of certain special assessments levied against Cloverdale's property by the City of Mandan for improvements constructed in Sanitary Sewer Improvement District No. 17. We affirm.

In 1977 the Board of City Commissioners of the City of Mandan created Sanitary Sewer Improvement District 17 (hereinafter Improvement District) for the purpose of constructing an interceptor sewer and improving the City's waste-water la-

goon facility. The Board of City Commissioners decided that the interceptor sewer needed to be constructed because the sewer lines in the vicinity of Cloverdale's property were experiencing "surcharging" and "critical velocity." The interceptor sewer was designed to reduce the flow in the sewer adjacent to Cloverdale's property by approximately 35 percent, thereby extending the life of the sewer and relieving the problems caused by the surcharging and critical velocity in the flows at that point.

The Board of City Commissioners additionally decided to enlarge the capacity of the existing waste-water lagoon to improve quality control and to enhance the waste-water discharges into the Missouri River in order to meet Environmental Protection Agency (E.P.A.) requirements and thereby avoid E.P.A. fines for noncompliance. The E.P.A. regulations required that Mandan's waste-water lagoon provide sufficient holding capacity for the waste waters from the entire city for a period of 180 days before the waste waters could be discharged into the Missouri River. E.P.A. threatened to impose fines against the City of Mandan of up to $10,000 per day and to prohibit the City from discharging its effluent into the Missouri River until E.P.A. regulations were complied with.

After the Board of City Commissioners created the Improvement District it appointed a special-assessment commission as required by Section 40–23–01, N.D.C.C. Subsequently, construction of the improvements took place. Once constructed, the interceptor sewer did not directly serve any property except through existing sewage-collector lines. The interceptor sewer does not serve the area of the city lying south of the Burlington Northern main track line. The waste-water lagoon facility does, however, treat waste water from the entire city.

The entire improvement project cost approximately 2.7 million dollars. The City received a grant from the E.P.A. to cover approximately 75 percent of the total cost and the City's share was 25 percent of the cost of the project.

The Special Assessment Commission of the City of Mandan in following the requirements of Section 40–23–07, N.D.C.C., determined that the benefits from the improvements were approximately 2.9 million dollars. The total amount assessed by the Commission for the waste-water lagoon facility improvement was $587,000 and $295,-000 was assessed for the interceptor sewer. The Commission assessed the costs of the waste-water lagoon improvements over the entire city and the cost of the interceptor sewer was assessed within the area of the city lying north of the Burlington Northern main line track.

In apportioning the benefits according to Section 40–23–07, N.D.C.C., the Special Assessment Commission determined that there was a direct relationship between the capacity required in the waste-water lagoon and its components such as pumps, mains, pipes, fittings, etc., and the water consumption of the individual water user in the city as recorded by the water meter of such user. The Commission also determined that there was a direct relationship between the capacity required in the interceptor sewer and the water consumption of the individual water user. The Commission based these determinations on testimony of engineers and on engineering studies.

The Special Assessment Commission used the following formula in determining benefits for assessments on the property in the District:

"a) A single family residence according to the City's records used an average of 800 cubic feet of water per month which was deemed to constitute one unit;

"b) Each multiple residence contained as many units as the separate dwelling units therein;

"c) Each mobile home park space was considered as a single unit;

"d) All tracts of land containing industry, business or warehouse facilities were assessed the number of units based on their average water usage and if less than 800 cubic feet per month was used it was considered as

one unit, and if an excess of 800 cubic feet per month, it was considered a multiple unit based on the 800 cubic foot figure;

"e) Vacant lots were assessed by the number of estimated units based on the Commission's exercise of a business judgment in the light of the zoning regulations in the area the lot was located and in the case of parking lots used in conjunction with an existing commercial or industrial facility the parking lots were not assessed but considered as committed to the main facilities; and

"f) In the case of all other properties including unplatted areas, areas where immediate use could not be ascertained, and lots not otherwise assessed, including unassessed parking lots, the City provided for the imposition of hook-up fees when and if the property was connected to the water and sewer system. Such fees are deposited into the Water and Sewer Utility Fund to be used for any purposes for which such funds can be lawfully used, including the maintenance of the sewer system."

The Special Assessment Commission determined that there were 8,174 units subject to a city-wide assessment to cover the incremental costs of the waste-water lagoon facility improvements which amounted to $72 per unit for that portion of the project. The Commission determined that there were 6,095 units lying north of the Burlington Northern main line track which were also to be assessed for the costs of the interceptor sewer trunk line and each unit was assessed $49 for that portion of the project. Thus all units lying north of the Burlington Northern main track line were assessed a total of $121 per unit ($72 + $49) and the area lying south of the track line was assessed only $72 per unit for the waste-water treatment facility.

The Special Assessment Commission, after having determined the benefits, prepared a complete assessment list setting forth each lot and parcel of land assessed, the amount each lot or tract was benefited by the improvements, and the amount to be assessed against each lot or tract as based upon the number of units.

Cloverdale's property consists of four lots in Mandan proper. The City metered Cloverdale's use of water for over one year and then determined that Cloverdale should be assessed on the equivalent of 170 units. Cloverdale was assessed a total of $20,532 for its share of the improvements. Cloverdale appealed its assessment to the Mandan Board of City Commissioners as allowed by Section 40-23-14, N.D.C.C. The assessment against Cloverdale was confirmed by the Board of City Commissioners. Cloverdale then brought suit in district court seeking to have the court declare the special assessment null and void or, alternatively, to require the City to reassess Cloverdale's lots. Cloverdale additionally sought an injunction to restrain the City from further collection of the assessment until the matter was resolved.

The district court determined that the Special Assessment Commission acted within its authority and the law, and that its determination was just, fair, reasonable, and supported by the evidence. The court further determined that the unit formula used by the Commission was not discriminatory, arbitrary, capricious, unjust, or inequitable and it dismissed Cloverdale's complaint on the merits and ratified and confirmed the benefits and assessments as determined by the Commission.

Cloverdale contends on appeal that the Special Assessment Commission acted arbitrarily and unreasonably in using an impermissible method, namely, water usage, to determine benefits and to apportion assessments for the sewer improvements.

■ This court has been especially aware of the constitutional doctrine of separation of powers in cases where we are required to review the decisions of special-assessment commissions. See, e.g., *Soo Line Railroad Company v. City of Wilton*, 172 N.W.2d 74 (N.D.1969). See also *Murphy v. City of Bismarck*, 109 N.W.2d 635 (N.D.1961). A special-assessment com-

mission is in essence a legislative tribunal created by legislative authority for the purpose of (1) determining the benefits accruing to the several tracts of land in an improvement district by reason of the construction of an improvement and (2) assessing the costs and expenses thereof against each tract in proportion to the benefit received. *Hale v. City of Minot*, 52 N.D. 39, 201 N.W. 848 (1924).

Our Legislature has provided for judicial review of special assessments in Section 40–26–01, N.D.C.C., which states:

"The courts shall review the levy and apportionment of the special assessments in all actions and proceedings involving the validity or apportionment of any special assessment for local or special improvements."

The standard of review in such cases was set forth in *Soo Line Railroad Company, supra*, 172 N.W.2d at 75, where this court stated:

"... the assessment of benefits made by the special assessment commission and confirmed by the city commission for street, curb, and gutter improvements which involve judgment and discretion will not be reviewed by the court, and it is not the province of the court to substitute its judgment for that of the commission making such decision, but merely to determine whether the commission was within its jurisdiction, was not mistaken as to the applicable law, and did not act arbitrarily, oppressively, or unreasonably, and to determine whether there is substantial evidence to support or justify the determination."

See also *Buehler v. City of Mandan*, 239 N.W.2d 522 (N.D.1976); *Chernick v. City of Grand Forks*, 210 N.W.2d 73 (N.D.1973); *United Public School Dist. No. 7 v. City of Burlington*, 196 N.W.2d 65 (N.D.1972). We have also stated that when presented with review of special assessments, "It is not the function of this court to try the case anew." *Buehler, supra*, 239 N.W.2d at 527.

An additional principle of law that has served to guide our review of special assessments is:

"Generally, all presumptions are in favor of the validity of assessments for local improvements and the burden is on persons attacking the validity of assessments to show that they are invalid." *Reed v. City of Langdon*, 78 N.D. 991, 54 N.W.2d 148, 150 (1952).

See also *Buehler, supra; Chernick, supra; Soo Line Railroad Company, supra*.

Section 40–23–07, N.D.C.C., sets forth the statutory requirements that a special-assessment commission must meet in determining benefits and in apportioning assessments.

Section 40–23–07 provides:

"Whenever the commission is required to make any special assessment under the provisions of this title, the members thereof personally shall inspect any and all lots and parcels of land which may be subject to such special assessment and shall determine from such inspection the particular lots and parcels of land which, in the opinion of the commission, will be especially benefited by the construction of the work for which the assessment is to be made. The commission shall determine the amount in which each of the lots and parcels of land will be especially benefited by the construction of the work for which such special assessment is to be made, and shall assess against each of such lots and parcels of land such sum, not exceeding the benefits, as shall be necessary to pay its just proportion of the total cost of such work, or of the part thereof which is to be paid by special assessment, ..."

■ It is clear that the Legislature has granted special-assessment commissions the authority to determine benefits and then to apportion assessments against each parcel of land specially benefited. The commission's discretion in apportioning assessments is limited by the general requirement that it may not make an assessment that exceeds the benefits accruing to that parcel of land from the improvement.

This court stated in *Murphy v. City of Bismarck, supra,* 109 N.W.2d at 646:

"The foundation of the power to lay a special assessment for a local improvement of any character, including the widening, paving, and otherwise improving a city street, is the benefit which the object of the assessment confers on the owner of the abutting property, or the owners of property in the assessment district, which is different from the general benefit which the owners enjoy in common with other inhabitants or citizens of the municipal corporation...."

See also 70 Am.Jur.2d, *Special Or Local Assessments,* § 18, p. 858.

We have previously set forth the three requirements that must be met for a special assessment to conform to Section 40–23–07, N.D.C.C. In *Northern Pacific Railroad Co. v. City of Grand Forks,* 73 N.W.2d 348, 351 (N.D.1955), this court said:

"The special benefit accruing to each lot or parcel of land from the improvement must be determined. The special assessment levied against each lot must be limited to its just proportion of the total cost of the improvement. The assessment against any lot or parcel of land must not exceed the benefit which has been determined to have accrued thereto."

In 14 McQuillin *Mun.Corp.* (3rd Ed. rev. 1970), we read:

"The rule that a method of assessment cannot be arbitrary, and must have some relation to the benefits appears reasonable. It would seem that the legislature is competent to judge of benefits. This is assumed by the current of authority. A public improvement having been made, the question of determining the area benefited by such improvement is generally held to be a legislative function, and such legislative determination, unless palpably unjust, is usually conclusive, and not subject to judicial interference unless arbitrariness, abuse or unreasonableness be shown. The prohibition is that special taxes or local assessments shall not be levied in excess of the benefits conferred, whether by the valuation, front foot, area, or any other method. [§ 38.02, pp. 19–20]

\*       \*       \*       \*       \*       \*

"... where the assessment exceeds the value of the benefits to the property assessed, it is, as to the excess, a taking of property without due process of law, as contemplated by the federal and state constitutions; ..." [§ 38.124, p. 300]

McQuillin also states:

"... Where no rule of apportionment is prescribed by statute or charter, the municipality may adopt 'any mode that would be fair and legal' and such as would secure an assessment in proportion to the benefits accruing as nearly as practicable. 'Absolute equality is not to be expected.' ...

"... While municipal authorities usually have a wide discretion in the apportionment of assessments, ... the method prescribed by law must be strictly followed...." [§ 38.121, p. 293]

See 70 Am.Jur.2d, *Special Or Local Assessment,* § 23, p. 864.

It is generally held that an "assessment may be apportioned according to frontage, area, value of, or estimated benefits to, the property assessed, or according to districts or zones, or on any other reasonable basis that is fair, just, and equitable." 63 C.J.S. *Municipal Corporations* § 1423, p. 1212. See also *In re Eight and One-Half Mile Relief Drain,* 369 Mich. 641, 120 N.W.2d 789 (1963).

This court has previously stated:

"... that it is the total work product which was used in determining the final assessment which is important, rather than the exact method used in determining the assessment." *United Public School Dist. No. 7, supra,* 196 N.W.2d at 69.

In *Patterson v. City of Bismarck,* 212 N.W.2d 374 (N.D.1973), this court upheld a formula used by a special-assessment commission to make assessments for the construction of a multilevel parking ramp within a parking improvement district. In

that case the assessment formula took into consideration the proportionate parking needs of each lot, tract, or parcel within the improvement district, the existing parking provided by that lot, tract, or parcel, and the nature and size of the business being conducted thereon. Thus, essentially what the special-assessment commission did in *Patterson* was to weigh the burden placed on the parking facility by each of the various businesses and determine the benefits to each of the businesses accordingly.

In the case at bar the Special Assessment Commission employed the "water use" method to weigh the burden each lot placed upon the interceptor sewer and waste-water lagoon facility. The Commission relied upon the expertise of the City's engineers and upon engineering studies in determining that there was a direct relationship between water use and the size of the improvement facilities. Although it may be a somewhat novel method of assessing benefits, it appears undeniable that "water use" does have a direct relationship to the size and capacity of sewerage facilities needed. We believe that the Commission properly exercised its authority and discretion in choosing to employ a "water use" method of assessment and that in this case the "water use" method was a fair, just, and equitable method of determining benefits.

We additionally believe that Cloverdale, as a large commercial water user, has received a special benefit because of the improvements to the sewerage facilities; that the special assessment against Cloverdale's four lots is justly proportional to the total cost of the sewerage facility improvements; and that the special assessment against Cloverdale does not exceed the benefits which it has received by way of the sewerage facility improvements.

The judgment of the trial court is affirmed.

ERICKSTAD, C.J., GIERKE, J., and PEDERSON, Surrogate Justice, concur.

PEDERSON, Surrogate Justice, participated.

Justice PAUL M. SAND, who died on December 8, 1984, was a member of this Court at the time this case was submitted.